Victor de Gyarfas (SBN 171950)
vdegyarfas@foley.com
Jean-Paul Ciardullo (SBN 284170)
jciardullo@foley.com
Ashley M. Koley (SBN 334723)
akoley@foley.com
Laura Moedano (SBN 334156)
lmoedano@foley.com
FOLEY & LARDNER LLP
555 South Flower Street, Suite 3300
Los Angeles, CA 90071-2418
Telephone: 213-972-4500
Facsimile: 213-486-0065

Naikang Tsao (SBN 164180)
ntsao@foley.com
FOLEY & LARDNER LLP
150 East Gilman Street
Madison, WI 53703
Telephone: 608-258-4250
Facsimile: 608-258-4258

Attorneys for Plaintiff
SHIJIAZHUANG HONGRAY GROUP

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## EASTERN DIVISION

| | |
|---|---|
| SHIJIAZHUANG HONGRAY GROUP, a Chinese Corporation,<br><br>*Plaintiff*,<br><br>v.<br><br>WORLD TRADING 23 INC., a California Corporation, and WORLD TECH TOYS, a California Corporation,<br><br>*Defendants*. | Case No. 5:21-cv-00972 FWS (SHKx)<br><br>**PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR SANCTIONS**<br><br>Hon. Shashi H. Kewalramani<br><br>Date:        January 3, 2024<br>Time:        10:00 AM<br>Courtroom: Riverside, Courtroom 3 or 4 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on Wednesday, January 3, 2024, at 10:00 AM before the Honorable Shashi H. Kewalramani in the Riverside Courtroom 3 or 4, 3rd Floor, Plaintiff Shijiazhuang Hongray Group ("Hongray") will, and hereby does, respectfully move the Court pursuant to the August 14, 2023 Supplemental Discovery Order (Dkt. 155, "August 14 Order"), Federal Rule of Civil Procedure 37, and the Court's inherent power for an order authorizing discovery sanctions against defendants World Trading 23, Inc. and World Tech Toys (together, "WTT").

This Motion is made following numerous ongoing conferences of counsel over more than a year, as detailed in this Motion and the accompanying Declarations. This Motion is made pursuant to the Court's August 14, 2023 Order and is based on this Notice of Motion and Motion, Memorandum of Points and Authorities, the accompanying declaration of Ashley M. Koley, the accompanying Proposed Order, and all pleadings, papers, and records on file in this action, and such matters of which this Court may take judicial notice, and upon such further oral argument and documentary evidence as may be presented at the time of hearing.

Dated: November 24, 2023

FOLEY & LARDNER LLP

*/s/ Jean-Paul Ciardullo*
Jean-Paul Ciardullo

Attorneys for Plaintiff SHIJIAZHUANG HONGRAY GROUP

# TABLE OF CONTENTS

I.    BACKGROUND .................................................................................. 1

    A.    WTT's Counterfeiting of Hongray's Medical Gloves .............................. 1

    B.    Hongray's Diligent Discovery Efforts ................................................... 2

    C.    WTT Invents A Narrative .................................................................. 3

    D.    WTT's Deficient Production Of Documents ......................................... 6

    E.    Hongray's 2022 Motion To Compel And The Court's September 2022 Discovery Order ........................................................................... 7

    F.    Hongray's Attempts to Obtain Further Discovery .................................. 8

        1.    The Withheld Bur-Tex Transaction ............................................. 8

    G.    WTT Forces Hongray To Oppose Baseless Motions ............................... 11

    H.    Hongray Independently Obtains Complete Shipping Records ................... 11

    I.    WTT's Belated Production, And The Court's August 14 Order For Supplemental Discovery ................................................................ 12

    J.    Supplemental Discovery Reveals The Extent Of Withheld Discovery ..... 13

II.   LEGAL STANDARD ......................................................................... 17

III.  ARGUMENT...................................................................................... 17

    A.    WTT's Violations Of The Discovery Order Are Clear............................. 17

        1.    WTT Failed To Even Search For The Word "Hongray" .............. 17

        2.    WTT Failed to Produce Shipment and Import Records............... 18

        3.    WTT Failed To Provide Customer Information ......................... 20

        4.    WTT Failed to Provide Information Concerning Its Profits and Expenses ................................................................. 21

    B.    WTT Engaged In Spoliation As To Product Labeling Evidence.............. 21

    C.    WTT Continues To Withhold Communication With Its Supplier, Elaine

Dong ...................................................................................................... 22

    D.    WTT Should Be Sanctioned ..................................................... 23

IV.   CONCLUSION .................................................................................... 27

4883-5605-7233.6

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Blumenthal Distrib., Inc. v. Herman Miller, Inc.*,
    No. EDCV141926JAKSPX, 2016 WL 6609208 (C.D. Cal. July 12, 2016)......25, 26, 28

*Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*,
    259 F.3d 1186 (9th Cir. 2001) ...................................................................27

*Fontana Products Inc. v. Spartech Plastics Corp.*,
    6 Fed. Appx. 591 (9th Cir. 2001) ..............................................................17

*Gonzales v. United States*,
    No. C-08-03189 SBA(EDL), 2010 WL 1838948 (N.D. Cal. May 4, 2010).................22

*Hawkins v. Kroger Co.*,
    No. 3:15-CV-02320-JM-AHG, 2020 WL 1952832 (S.D. Cal. Apr. 23, 2020) .............17

*In re Grand Jury Investigation*,
    974 F.2d 1068 (9th Cir. 1992) ...................................................................23

*Madrigal v. Allstate Indem. Co.*,
    No. CV 14-4242 SS, 2015 WL 12748277 (C.D. Cal. Nov. 5, 2015)...........................23

*N. Am. Watch Corp. v. Princess Ermine Jewels*,
    786 F.2d 1447 (9th Cir. 1986) ...................................................................26

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
    427 U.S. 639 (1976) ...............................................................................26

*Peat, Marwick, Mitchell & Co. v. West*,
    748 F.2d 540 (10th Cir.1984) ...................................................................24

*Ramirez v. County of L.A.*,
    231 F.R.D. 407 (C.D. Cal. 2005)................................................................23

*Reinsdorf v. Skechers U.S.A., Inc.*,
    296 F.R.D. 604 (C.D. Cal. 2013)................................................................21

**Rules**

Fed. R. Civ. P. 26(b)(5)...........................................................................23

Rule 37(b)(2)........................................................................................17

Pursuant to this Court's August 14, 2023 Supplemental Discovery Order (Dkt. 155 at 10), Rule 37, and the Court's inherent powers, plaintiff Shijiazhuang Hongray Group ("Hongray") files this motion for discovery sanctions against defendants World Trading 23, Inc. and World Tech Toys (together, "WTT"). For the reasons stated below, WTT should be sanctioned based on its contempt of this Court's September 6, 2022 Order (Dkt. 42, "Discovery Order") and other discovery misconduct in withholding the vast majority of discoverable documents and information in this case, and subjecting Hongray to hundreds of hours of needless motion practice and supplemental discovery efforts concerning the same.

# I.   BACKGROUND

## A.   WTT's Counterfeiting of Hongray's Medical Gloves

This suit arises out of WTT's unauthorized sales of counterfeit personal protective equipment during the COVID pandemic, specifically, low-quality medical gloves that were falsely advertised to be 100% nitrile, and that falsely identified Hongray as their manufacturer and/or were otherwise marketed as having originated from Hongray. (*See* Dkt. 13.) Hongray sent WTT a cease-and-desist on April 1, 2021, but evidence obtained during the recent Court-ordered Supplemental Discovery period now confirms that WTT continued to sell its glove stock after receiving Hongray's letter, and even after Hongray filed this suit until they were all gone. In all, WTT had sold approximately 3.5 million boxes of gloves (Dkt. 146-1, ¶14) by September 2022. (Declaration of Ashley M. Koley ("Koley Decl.") ¶4.)

In its June 9, 2021 Complaint, Hongray alleged that WTT "imported millions of boxes of [] gloves from" third parties Feida Toys and/or KMI, which were counterfeit, which were "distributed in boxes that falsely state[d]" that the manufacturer was Hongray and among other things, "FDA CERTIFIED" under Hongray's subsidiary's factory's FDA 510(k) clearance numbers. (Compl. ¶¶14,16,18 (Dkt. 1).) Attached to the complaint is a photo of a box of the counterfeit gloves that shows the false designation of origin (highlighted). Although WTT branded the gloves as "PPE-AID," WTT falsely claimed that

they originated from Hongray:





On July 1, 2021, Hongray filed its first amended complaint. (Dkt. 13 ¶¶25-40.)

Under the original scheduling order, fact discovery closed on February 2, 2023. (Dkt. 36.)

**B.    Hongray's Diligent Discovery Efforts**

On November 24, 2021, Hongray served its first set of requests for production ("RFPs") on WTT, which included the following:

- <u>RFP No. 3</u>: "All communications with Feida Toys[, WTT's broker in China,] relating in any way to At Issue Products."

- <u>RFP No. 8</u>: "All Communications with third parties that contain the term "Hongray" or any variant thereof in the Communication."

- <u>RFP No. 26</u>: "Documents sufficient to identify any person or individual to…whom Defendant…sells…any At Issue Products."

- <u>RFP No. 27</u>: "Documents sufficient to identify each price at which Defendant has…sold…any At Issue Product."

- RFP No. 35: "Documents sufficient to show the calculation of the gross and net profits realized by Defendant, directly or indirectly, from the sale of At Issue Products."

- RFP No. 36: "Documents sufficient to show any costs or expenses incurred by Defendant in connection with any At Issue Products, including all documents on which you intend to rely to show your costs or expenses in this proceeding."

- RFP No. 43: "All Documents and Communications relating to [WTT's] import of At Issue Products, including but not limited to any U.S. customs Documents and Communications with any Forwarding Agents."

(Dkt. 146-1, Ex. A.) The document requests defined "*At Issue Products*" to mean "any and all products that [WTT] has imported, marketed, distributed, and/or sold as having been manufactured or approved by Hongray[.]" (*Id.*, ECF page 10.)

### C.   WTT Invents A Narrative

According to WTT's unsupported narrative, only about 900,000 of the 3.5 million boxes of gloves that WTT imported were labeled or sold as originating from Hongray (the rest supposedly labeled as originating elsewhere), and this subset was sold at a total loss, conveniently insulating WTT from any damages liability in this case. (Dkt. 54 at ECF page 15-16 of 17; Dkt. 54-1 at ¶¶4,6,17,18 (ECF pages 2-5.) Further, WTT falsely claims that the 900,000 box subset actually are authentic Hongray gloves. Specifically, WTT's pleadings allege:

"At issue in this action are an estimated 1 million[1] 100-count boxes of disposable gloves…that [it] purchased…from [Hongray] and one of its subsidiaries,…through Elaine Dong of Feida Toy[s] Company," a second Chinese company (HKMI), and a broker (JinJun Zhu). (Dkt. 146-1 at ECF page 67.)

WTT purported to have two non-customers for these gloves: (1) a wholesaler called Win Partners, LLC ("Win Partners"); and (2) Mind 2 Market Product Development LLC ("M2M"). (Dkt. 54-1 at ¶¶3, 6, 17 & Ex. 6 (ECF pages 2, 4-5, 51-52).) "The Gloves

---

[1] The actual number of boxes in the bills of lading WTT relies upon are under 900,000.

[allegedly] began shipping out of China in late February 2021 and arrived in the United States beginning in March 2021." (Dkt. 54-1 at ¶9 (ECF page 3 of 52).)

As WTT tells it, after Hongray filed its lawsuit, WTT's principal (Kevork Kouyoumjian) confirmed the authenticity of the "Hongray" gloves in an exchange of emails with Hongray.[2] (*Id.* at ¶¶10, 12.) In actuality, Hongray never had any communications with WTT. According to Kouyoumjian, he "was informed by [Hongray subsidiary Hongze Plastic Technology] employees to send an email from a Chinese email account to [Hongray's] official sales email address of sales@hongray.com.cn[.]" (*Id.* at ¶13.)

In July 2021, Kouyoumjian "personally set up an email account with Sohu.com, a large Chinese email server, with the email address of Wt98721@sohu.com[,]" allegedly for that sole purpose. (*Id.*) Then, on July 19, 2021 (at *2:56* a.m.), Kouyoumjian asserts that he sent the following email to "sales@hongray.com.cn," with no text other than the date in the "Subject" line:

| | |
|---|---|
| **From:** | wt98721 <wt98721@sohu.com> |
| **Sent:** | Monday, July 19, 2021 2:56 AM |
| **To:** | sales |
| **Subject:** | 7-19-21 |

(*Id.* at ¶14 & Ex. 3 (ECF page 33 of 52).) Having received no response to his 2:56 a.m. email, Kouyoumjian sent a second email on July 19 (at *4:54* a.m.), which added the date (and nothing else) to the text of the email:

| | |
|---|---|
| **From:** | wt98721 <wt98721@sohu.com> |
| **Sent:** | Monday, July 19, 2021 4:54 AM |
| **To:** | sales |
| **Subject:** | 7-19-21 |

7-19-21

(*Id.* at ECF page 32 of 52.)

---

[2] WTT does not even try to argue that it undertook any effort to confirm the authenticity of the gloves *before* it bought them and started selling them.

4883-5605-7233.6

Defendants produced a document presented as an email that shows a purported email reply from sales@hongray.com.cn sent forty-three minutes after receiving Kouyoumjian's 4:54 a.m. email, purporting to attach  images of eight documents on July 19 (at 5:37 a.m. pacific time, 8:37 p.m. China time), with no accompanying text:

| | |
|---|---|
| **From:** | sales <sales@hongray.com.cn> |
| **Sent:** | Monday, July 19, 2021 5:37 AM |
| **To:** | wt98721@sohu.com |
| **Subject:** | Re:7-19-21 |
| **Attachments:** | 1622828131798.jpg; 1622828131999.jpg; 1622828132013.jpg; 1622828132025.jpg; 1622828132033.jpg; 1622828132042.jpg; 1622828132049.jpg; mmexport1626684029366.jpg |

=includetail>

(Dkt. 54-1 at ¶14 & Ex. 4 (ECF page 35 of 52).) WTT contends that this purported email and eight documents confirm the authenticity of the purported 900,000 boxes of "Hongray" gloves. (*Id*. at ¶¶14-15; Dkt. 54 at 3 (ECF page 8 of 17).) This "evidence" consists of bizarre pictures and videos, and purported signed certifications by Hongray's chief executive, Mr. GuiXi Liu. (Dkt. 54-1 at ECF page 35-50; Dkt. 63-8 ¶¶4-6, Ex. J-L.)

Hongray has since demonstrated in prior briefing that these documents are all fabrications. (*See*, *e.g.*, Dkt. 63 at ECF pages 9-10.) Hongray was able to show that Mr. Liu never signed any such certifications, that the purported emails never were in Hongray's servers, and, according to computer forensics expert Daniel L. Regard, the purported emails are unreliable for a variety of reasons. (*See* Dkt. 63-6 ¶¶3A-G; Dkt. 63-7 ¶¶3A-G (English translation of Dkt. 63-6); Dkt. 63-8 ¶¶2-7, 10-12; Dkt. 63-10 at ECF pages 13-26 of 31.) Furthermore, chemical testing expert Dr. Michael Dimitriou confirmed that the falsely labeled PPE-AID gloves were not 100% nitrile, and thus did not meet the standards associated with Hongray's subsidiary factories' FDA 510(k) standards to which Defendants marketed them under. (Dkt. 63-9 at ECF page 25 of 62.) Of particular concern is Mr. Kouyoumjian's recent admission in his supplemental deposition that the false certification from "Mr. Liu" may have been drafted by one of his lawyers. (Declaration of Ashley M. Koley ("Koley Decl." ¶5.)

Even after being presented with indisputable and unrebutted evidence that the documents presented as purported email responses from sales@hongray.com.cn were fake, WTT has continued to press its narrative—that Hongray had confirmed the authenticity of the purported "at issue" gloves—through summary judgment. Specifically, in its January 26, 2023 motion for summary judgment, WTT argued that Hongray "has not presented any evidence that the [900,000 boxes of] Gloves were not produced by and/or sourced from either [Hongray]" or its subsidiary. (Dkt. 54 at 3, 8-9 (ECF pages 8, 13-14 of 17.))

### D.   WTT's Deficient Production Of Documents

On April 18, 2022, WTT produced 32 Air Tiger Express bills of lading ("BoLs") (WTT000054-85), which identify "Hongray" as the source of the gloves being shipped. (Koley Decl. ¶6.) The total quantity of gloves in these 32 BoLs is 84,156 cartons (841,560 boxes) of gloves. (*Id.*)

Below is a sample BoL (WTT000055), which identifies the broker (Feida Toys), the recipient (defendant World Trading 23, Inc.), the number of cartons of gloves in the shipment (2927), "Hongray" in the shipping mark box, and the date of export (2/15/21) in the lower right-hand corner:

(Koley Decl. ¶6.)

Compared to the thousands of documents Hongray recently managed to obtain, it is now apparent that WTT's document productions were woefully deficient. (Koley Decl. ¶7.) Despite this, on May 5, 2022, WTT's counsel informed Hongray that WTT's document production was complete: "You now have all non-privileged documents within our client's possession, custody, and control." (Dkt. 39-10 at ECF page 1 of 11.)

**E.      Hongray's 2022 Motion To Compel And The Court's September 2022 Discovery Order**

On August 9, 2022, Hongray filed a motion to compel with respect to RFP Nos. 3, 26, 27, 35, 36 and 43 (and others). (Dkt. 38.) The Court's September 2022 Discovery Order (Dkt. 42) granted the motion in relevant part, and ordered WTT to "serve supplemental

CASE NO. 5:21-CV-00972 FWS (SHKx)
HONGRAY SANCTIONS MOTION

4883-5605-7233.6

responses clearly stating they have conducted a diligent search and have produced all non-privileged documents in their possession, custody, or control" (Dkt. 42 at 15), and to "produce all responsive documents" "[n]o later than September 12, 2022." (*Id*. at 20.)

In response to the Discovery Order, on September 12, 2022, WTT served its second amended responses to Hongray's document requests. (Dkt. 146-1, Ex. F.) WTT's modest supplemental document production offered no more insight into WTT's customers, financials, or glove sales. (Koley Decl. ¶8.) WTT represented in its responses that it had conducted a diligent search and had nothing more to produce. (Dkt. 146-1, Ex. F, ECF pages 101-11 of 117.)

### F.     Hongray's Attempts to Obtain Further Discovery

Faced with WTT's unconvincing September 12, 2022 certification, Hongray was was certain that WTT was concealing a large amount of relevant documents, but knew that it would now need to pursue other sources of evidence.

#### 1.     The Withheld Bur-Tex Transaction

In mid-November 2022, Hongray learned that Bur-Tex Hosiery, Inc. had filed a lawsuit in October 2022 against WTT alleging that WTT had sold it $5.3 Million in counterfeit nitrile PPE-AID gloves, some or all of which were marketed and labeled with Hongray's name and 510(k) certifications. (Dkt. 64-1 at ¶10; *see also Bur-Tex Hosiery, Inc. v. World Tech Toys, Inc.*, No.. 2:22-cv-07547-FWS-KK (C.D. Cal. filed Oct. 17, 2022) (Dkt. 1.) The *Bur-Tex* complaint includes information concerning fake certifications with 510(k) numbers that concern gloves purportedly manufactured by Hongray. (Dkt. 64-1, ¶64, ECF page 110-11.) Notably, counsel for WTT in the *Bur-Tex* matter are the same counsel representing WTT in this litigation, yet counsel for WTT failed to notify Hongray of the *Bur-Tex* matter or provide any related documents.

Hongray promptly contacted Bur-Tex and, in January 2023, Bur-Tex provided a sample box of PPE-AID gloves that it purchased from WTT, which identifies "Shijiazhuang Hongray Group Co. Ltd." on the glove packaging. (Dkt. 64-1 at ¶10.) Bur-Tex also provided various documents and related emails from Kouyoumjian and WTT's

warehouse manager, Ramiro Barajas, that WTT had not produced. (*Id.*) Below are pictures that Bur-Tex has provided of the WTT gloves it received featuring Hongray's name. (Dkt.  64-3 at ECF pages 5-6.)





(Dkt. 64-1 at ECF page 71.)

Hongray pursued further third-party discovery, including sending subpoenas to WTT's co-defendants in the *Bur-Tex* lawsuit. Each of those co-defendants either outright dodged service, or otherwise declined to produce documents. (Dkt. 64-1 ¶ 9.)

### 1.    Win Partners and M2M

Because WTT claimed that the only "Hongray" gloves it acquired went to two entities, Win Partners and M2M. Hongray deposed them on October 21, 2022 and November 16, 2022, respectively. (Dkt. 64-1 at ¶¶6, 12 (ECF pages 2-3 of 116).)

Win Partners produced documents evidencing undisclosed sales of WTT's gloves to various medical clinics. (*Id.* at ¶3 & Ex. 1 (ECF pages 2, 9-17 of 116).) After WTT continued to refuse to produce any information concerning the sales to the clinics, and the clinics were unwilling to provide any information without a subpoena, Hongray served document subpoenas on six clinics in late December 2022 and the first week of January 2023. (Dkt. 64-1 ¶16.) While not all responded, at least one – Nomi Health – produced documents evidencing previously-undisclosed sales of "Hongray" gloves by WTT. (*Id.* ¶14-16, ECF pages 35-53.)

WTT represented to Hongray and the Court that M2M never paid WTT for gloves. (Dkt. 54-1, ¶17.) At its deposition, M2M testified that a Florida attorney, Roberto Villasante, handled the payments to WTT. Hongray reached out to Villasante to inquire about these transactions in January 2023, but he failed to produce documents relating to these transactions. (Dkt. 64-2 at ¶9.) The supplemental discovery revealed that Mr. Kouyoumjian, had emailed Villasante on January 9, 2023 discouraging Villasante from cooperating withHongray. (Koley Decl. ¶9, Ex. 1.) One month later, Kouyoumjian testified on February 16, 2023, that he did not independently recall seeing any documents that related to Mr. Villasante in his alleged search for documents.  (*Id.* at ¶14, Ex. 3 at 126:8-127:3.) Supplemental Discovery from Mr. Villasante revealed he, in fact made $1.77 million in glove payments to WTT for the Mind 2 Market transaction. (*Id.* ¶10.)

### 2.    Hongray's Meet and Confer Efforts with WTT

CASE NO. 5:21-CV-00972 FWS (SHKx)
HONGRAY SANCTIONS MOTION

4883-5605-7233.6

On December 9, 2022, Hongray's counsel served a L.R. 37-1 Letter raising Hongray's concerns, and pointing to the Bur-Tex and Nomi Health evidence. (Koley Decl. ¶11, Ex. 2.)   The parties met and conferred for an hour later that day, then again on December 16, 2022 and twice more on January 13, 2023 and January 16, 2023. Each time, in the face of contradictory evidence, WTT maintained its narrative that only about 900,000 boxes were at issue, and that these had been sold for a loss to only two customers. Hongray asked WTT to produce the balance of its records concerning the other two-thirds of the gloves that it had sold, rather than unilaterally limiting its production to only the 900,000 boxes that it asserted were "at issue," but WTT refused. (Dkt. 63-4, ¶¶4-5.)

### G.   WTT Forces Hongray To Oppose Baseless Motions

In WTT's January 26, 2023 Motion for Summary Judgment, and again in several of WTT's motions in limine,[3] WTT insisted that no evidence existed to contradict its narrative that it purchased 900,000 boxes of authentic Hongray gloves, which were sold at a loss to two entities (Win Partners and M2M). (Dkt. 54 at ECF pages 15-16.) Hongray incurred significant time and expense responding to WTT's motions, and also in preparing a Rule 56(d)/Rule 16(b) Motion seeking supplemental discovery in view of all the contradictory evidence and WTT's refusal to cooperate. (*See generally* Dkts. 63, 64.)

### H.   Hongray Independently Obtains Complete Shipping Records

On January 26, 2023, Hongray served a document subpoena on Straight Forwarding that sought the same documents that it had sought from WTT. (Dkt. 146-1 at ¶9 (ECF page 3 of 117).) WTT objected to the Straight Forwarding subpoena to the extent that documents would be received after the fact discovery cutoff. (*Id*. at ¶10.) Straight Forwarding did not respond to Hongray's document subpoena. (*Id*.)

Hongray separately obtained information from Pajiva.com, a website that tracks certain imports by sea into the United States, showing that WTT had imported a total of approximately 3 million boxes of gloves from WTT's Chinese supplier, Feida Toys. (Dkt.

---

[3] Motions in Limine were filed in anticipation of a June 2023 trial date, but have not yet been adjudicated.

64-1, ¶30 at ECF pages 90-98.) Having nothing else to rely on, Hongray's damages expert cited the Panjiva records in her February 15, 2023 expert report. (*See* Dkt. 166 at ECF page 7-8.)

On May 29, 2023, Hongray served a trial subpoena on Straight Forwarding, in anticipation of what was then the June 13, 2023 trial date. (Dkt. 146-1 at ¶12.) Although Hongray did not subpoena documents in its trial subpoena, Straight Forwarding voluntarily produced a large quantity of BoLs, invoices, U.S. customs documents and its email communications with WTT relating to its importation of PPE-AID gloves from WTT's agent in China, Feida Toys. (*Id*. at ¶13.) The Straight Forwarding records included 79 Air Tiger Express BoLs that reference "Hongray," 47 of which WTT failed to produce during fact discovery despite the fact that it had them in its possession. (*Id*. at ¶16.)

The trove of Straight Forwarding shipping records revealed that WTT imported close to 3.5 million boxes of gloves between August 2020 and March 2021, with *approximately 2.8 million boxes of gloves accompanied with documentation identifying Hongray as the manufacturer*. (Dkt. 146-1 at ¶14.) The records also showed that the "Hongray" gloves were arriving in the United States as early as January 2, 2021. (*Id.*) Thus, WTT's withheld shipping records directly contradicted WTT's narrative that only 900,000 boxes were at issue in the case. The reliability of the shipping records was attested to in a Declaration from Straight Forwarding. (Dkt. 146-2 at ¶¶10-12.)

On June 29, 2023, based on its third-party discovery, Hongray filed a motion to supplement the record ("Supplemental Motion") with respect to: (a) Hongray's opposition to WTT's motion for summary judgment (Dkt. 63); (b) Hongray's motion under Rule 56(d) for supplemental discovery concerning WTT's sales (Dkt. 64); and (c) WTT's motion in limine seeking to preclude Hongray from introducing any evidence related to WTT's sales or profits as to the 900,000 boxes of gloves that WTT claimed were at issue. (Dkt. 97.) (*See* Dkt. 146.)

## I.   WTT's Belated Production, And The Court's August 14 Order For Supplemental Discovery

CASE NO. 5:21-CV-00972 FWS (SHKx)
HONGRAY SANCTIONS MOTION

4883-5605-7233.6

In July of 2023, with the Straight Forwarding records having been revealed by Hongray's efforts, WTT went back and, for the first time, conducted a search of their emails for the word "Hongray." This search resulted in WTT's production of 3,244 documents with over 5,000 pages of previously withheld documents that were highly relevant, as detailed in the accompanying declaration. (Koley Decl. ¶12.)

On August 8, 2023, the parties filed a stipulation, agreeing to re-open discovery and continue the trial date. (Dkt. 153.)

On August 10, 2023, the Court re-heard oral argument on WTT's motion for summary judgment, Hongray's Rule 56(d) motion, alongside Hongray's motion to supplement the record and the parties' stipulation. (Dkt. 155 at 2.)

In its August 14, 2023 Order (Dkt. 155, "August 14 Order") granting Hongray's Supplemental Motion, the District Court found that Hongray "has been diligent both in obtaining additional evidence and in promptly presenting this evidence to the court." (*Id.* at 6.) Judge Slaughter also found that supplementation would not unfairly prejudice WTT because, as Hongray argued, WTT "failed to produce this evidence, in violation of their discovery obligations and a court order, in the first place[.]" (*Id.*)

The Court also directed WTT to complete production of documents pursuant to the Discovery Order no later than August 29, 2023. (Dkt. 155 at 9.) Notwithstanding this deadline, August 29 came and went and WTT did not make any production. (Koley Decl. ¶13.)

Finally, this Court granted a 90-day Supplemental Discovery period. (August 14 Order at 9.) In doing so, it again noted that Hongray had been diligent. (*Id.*)

## J.    Supplemental Discovery Reveals The Extent Of Withheld Discovery

### 1.    Shipping And Import Records

On July 24, 2023, WTT produced a total of 103 BoLs and accompanying shipping and customs documents,[4] which identify "Hongray" as the manufacturer of boxes of

---

[4] This production included a re-production of the 32 bills of lading that WTT produced in

gloves. (Koley Decl. ¶15.) These 103 BoLs account for almost 2.8 million boxes of gloves, *i.e.*, more than three times the number of boxes that WTT claimed were at issue (*Id*.) The 71 new BoLs that WTT produced have export dates that are before, in the midst of, and after the export dates in the 32 BoLs that WTT produced in April 2022. (*Id*.)

### 2.    WTT Sales Spreadsheet Identifying Customers And Pricing

On October 6, 2023, WTT produced a 15-page spreadsheet (WTT05626-40) that identifies its PPE-AID glove customers and the price they paid for gloves. (Koley Decl. ¶2.) Among other things, the spreadsheet includes columns for invoice number, item number, customer name, a description of what they purchased, the price per unit purchased (typically, per pair of gloves), the quantity ordered and the invoice date. (*Id*.) Below is an excerpt of the first twenty entries on page 1 of the WTT sales spreadsheet:

| invno | item | custno | loctid | descrip | disc | taxrate | price | qtyord | qtyshp | invdte | ponum |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 880804 | ZX-35288 | | ONSITE | Daily Sanitary Kit 4pc gloves, 2 Sanitizer bags, 2 masks | 0 | 0 | | -12 | -12 | 9/24/2020 0:00 | 606573821-861896 |
| 840049 | ZX-35189 | | ONSITE | Gloves 1 Pair | 0 | 0 | | 100 | 100 | 12/21/2020 0:00 | 102202012192325585556 |
| 943451 | ZX-35299 | | ONSITE | 10 Pairs (20 gloves) Gloves | 0 | 0 | | 48 | 48 | 1/12/2021 0:00 | 4501326258 |
| 913954 | ZX-35189 | | ONSITE | Gloves 1 Pair | 0 | 0 | | 50 | 50 | 11/3/2020 0:00 | 102202010171171821979 |
| 943455 | ZX-35288 | | ONSITE | Daily Sanitary Kit 4pc gloves, 2 Sanitizer bags, 2 masks | 0 | 0 | | 36 | 36 | 1/12/2021 0:00 | 4501259378 |
| 913425 | ZX-35189 | | ONSITE | Gloves 1 Pair - SMALL | 0 | 0 | | 5000 | 5000 | 10/30/2020 0:00 | |
| 913425 | ZX-35189 | | ONSITE | Gloves 1 Pair - MEDIUM | 0 | 0 | | 5000 | 5000 | 10/30/2020 0:00 | |
| 913425 | ZX-35189 | | ONSITE | Gloves 1 Pair - LARGE | 0 | 0 | | 5000 | 5000 | 10/30/2020 0:00 | |
| 844891 | ZX-35288 | | ONSITE | Daily Sanitary Kit 4pc gloves, 2 Sanitizer bags, 2 masks | 0 | 0 | | 42 | 42 | 7/16/2020 0:00 | Our SO # 845216 |
| 957975 | ZX-35189 | | ONSITE | Gloves 1 Pair - SMALL | 0 | 0 | | 1093000 | 1093000 | 1/8/2021 0:00 | 912847 |
| 957975 | ZX-35189 | | ONSITE | Gloves 1 Pair - MEDIUM | 0 | 0 | | 1762350 | 1762350 | 1/8/2021 0:00 | 912847 |
| 957975 | ZX-35189 | | ONSITE | Gloves 1 Pair - LARGE | 0 | 0 | | 1134500 | 1134500 | 1/8/2021 0:00 | 912847 |
| 957975 | ZX-35189 | | ONSITE | Gloves 1 Pair - X-LARGE | 0 | 0 | | 4010150 | 4010150 | 1/8/2021 0:00 | 912847 |
| 844891 | ZX-35299 | | ONSITE | 10 Pairs (20 gloves) Gloves | 0 | 0 | | 24 | 24 | 7/16/2020 0:00 | Our SO # 845216 |
| 913956 | ZX-35189 | | ONSITE | Gloves 1 Pair | 0 | 0 | | 1100 | 1100 | 11/3/2020 0:00 | 102202010241771541840 |
| 918210 | ZX-35299 | | ONSITE | 10 Pairs (20 gloves) Gloves | 0 | 0 | | 120 | 120 | 11/23/2020 0:00 | 4501243073 |
| 918210 | ZX-35299 | | ONSITE | 10 Pairs (20 gloves) Gloves | 0 | 0 | | 120 | 120 | 11/23/2020 0:00 | 4501243073 |
| 844919 | ZX-35299 | | ONSITE | 10 Pairs (20 gloves) Gloves | 0 | 0 | | 24 | 24 | 7/16/2020 0:00 | Our SO # 845217 |
| 844919 | ZX-35288 | | ONSITE | Daily Sanitary Kit 4pc gloves, 2 Sanitizer bags, 2 masks | 0 | 0 | | 42 | 42 | 7/16/2020 0:00 | Our SO # 845217 |
| 956622 | ZX-35288 | | ONSITE | Daily Sanitary Kit 4pc gloves, 2 Sanitizer bags, 2 masks | 0 | 0 | | 12 | 12 | 2/9/2021 0:00 | 4501361742 |

(*Id*. (excerpting WTT05626).) The customer names are redacted (in red). The price per unit is redacted (in orange). As an example, the four entries highlighted in yellow relate to a single order (four sizes) involving a total of eight million pairs of gloves (*i.e.*, 160,000 boxes of gloves), which WTT invoiced on January 8, 2021 (in blue). (*Id*.)

The spreadsheet contains information relating to transactions with entities that WTT contends ordered and received "Hongray" gloves, including M2M (identified at WTT05637). (*Id*.)

### 3.    WTT's Costs And Expenses

April 2022 and a reproduction of the documents produced by Straight Forwarding in July 2023.

On November 5, 2023, WTT produced documents relating to its costs and expenses, including a summary of paychecks issued to warehouse department staff (WTT06073 – WTT06227), and a lease agreement for its warehouse (WTT06228 – WT06303). (Koley Decl. ¶16.)

### 4. Emails That Contradict WTT's Narrative About The July 2021 Email

On October 27, 2023, WTT produced, for the first time, emails from a ***second*** "sohu.com" account, wkr02258@sohu.com, which differs from the one (wt98721@sohu.com) that Kouyoumjian asserted that he created to communicate with Hongray. (Koley Decl. ¶17; see also, *supra*, I.C.1.) Kouyoumjian testified that he believed the wkr02258@sohu.com account belongs to Elaine Dong, even though the emails were extracted from Kouyoumjian's phone. (*Id.*) These new documents purport to show that, on June 9, 2021, "sales@hongray.com.cn" emailed wkr02258@sohu.com seven of the eight "Hongray" documents that Kouyoumjian claims that he received on July 19, 2021, to his wt98721@sohu.com account. (*See* Dkt. 54-1 at ¶13):

| | |
|---|---|
| **Date:** | Wed, 9 Jun 2021 11:25:35 AM -0500 |
| **Sent:** | Wed, 9 Jun 2021 11:25:33 AM -0500 |
| **Subject:** | 证明 |
| **From:** | sales <sales@hongray.com.cn> |
| **To:** | wkr02258 <wkr02258@sohu.com>; |
| **Attachments:** | 合同资料 2021-06-09 23.02_3.jpg; 合同资料 2021-06-09 23.02_2.jpg; mmexport1623242402772.jpg; mmexport1623242399448.jpg; 1622828131999.jpg; 1622828132033.jpg; 1622828132042.jpg |

Dear WORLD TECH TOYS

附件盖章确认OK给您们，请查收。

Tks

(Koley Decl., ¶18, Ex. 4 (WTT_PROD_40150-57).)

On July 9, 2021, the same alleged "sales@hongray.com.cn" purports to send the same seven documents to wkr02258@sohu.com again. (*Id.* at ¶19, Ex. 5 (WTT_PROD_40159-66).)

On July 15, 2021, the eighth document attached to the purported July 19 email was allegedly sent from "sales@hongray.com.cn" to wkr02258@sohu.com:

| | |
|---|---|
| **Date:** | Thu, 15 Jul 2021 8:57:14 AM -0500 |
| **Sent:** | Thu, 15 Jul 2021 8:49:28 AM -0500 |
| **Subject:** | 鸿锐内部文件 |
| **From:** | sales@hongray.com.cn |
| **To:** | wkr02258@sohu.com; |
| **Attachments:** | 0715214615.png |

(*Id.*, ¶20, Ex. 6 (WTT_PROD_40167-68).)

The suspicious nature of these redundant and inexplicable emails further supports the conclusion that the purported "Hongray" records were fabricated. These emails were withheld despite their responsiveness to Hongray's RFP No. 8 ("All Communications with third parties that contain the term 'Hongray'...") (Dkt. 146-1, Ex. A (ECF page 15 of 117).)

## II.   LEGAL STANDARD

Rule 37 of the Federal Rules of Civil Procedure provides for the imposition of sanctions against a party who fails to make discovery or to obey a discovery order. The sanctions expressly stated in Rule 37(b)(2) include precluding the introduction of evidence, and assessing reasonable expenses, including attorney's fees. *See Fontana Products Inc. v. Spartech Plastics Corp.,* 6 Fed. Appx. 591 (9th Cir. 2001) ("[Rule 37] grants a district court broad discretion in shaping sanctions, providing a nonexhaustive list of suggestions and granting it the power to make 'such orders in regard to the failure as are just.'"). Sanctions under Rule 37 are intended to serve three purposes: (1) to ensure that a party will not benefit from its own failure to comply; (2) to obtain compliance with the particular order issued; and (3) to provide a general deterrent both as to the case at hand and to other litigation, provided that the party against whom they are imposed was in some sense at fault. *Hawkins v. Kroger Co.*, No. 3:15-CV-02320-JM-AHG, 2020 WL 1952832, at *25 (S.D. Cal. Apr. 23, 2020), *objections sustained in part and overruled in part on other grounds*, No. 15CV2320 JM(AHG), 2020 WL 6150040 (S.D. Cal. Oct. 20, 2020).

A party's failure to comply with a court's discovery order also constitutes contempt, and Rule 37 provides relief for such contempt. The Court also has inherent authority to craft sanctions to address contempt of its own orders.

## III.   ARGUMENT

### A.   WTT's Violations Of The Discovery Order Are Clear

#### 1.   WTT Failed To Even Search For The Word "Hongray"

As discussed in Section I.J, *supra*, it was not until long after the regular discovery period had ended that WTT ever conducted a basic search across its emails and text message records for the word "Hongray," which apart from being responsive to Hongray's RFP No. 8, is unquestionably the most obvious search that WTT should have performed. Supplemental Discovery has now revealed that 2776 emails and 613 text messages referred to Hongray, and 107 text messages that referred to Hongray's subsidiary factory, Hongze. (Koley Decl. ¶24.) Although RFP No. 8 was not itself specifically at issue in the Discovery

CASE NO. 5:21-CV-00972 FWS (SHKx)
HONGRAY SANCTIONS MOTION

4883-5605-7233.6

Order, WTT cannot claim to have otherwise abided by that order when it failed to ever conduct such a fundamental search before certifying that its document production was complete. WTT's failure to have searched for all "Hongray" records is otherwise sanctionable under Rule 37.

### 2. WTT Failed to Produce Shipment and Import Records

The supplemental discovery period confirms that WTT withheld large numbers of shipping records responsive to Hongray's RFP No. 43, in violation of the Discovery Order. The 103 BoLs, packing slips, proforma invoices, and U.S. customs documents that WTT has now produced account for almost 2.8 million boxes of gloves, *i.e.*, more than three times the number of boxes that WTT claimed were at issue. (Koley Decl. ¶15.)

There is no excuse why WTT failed to produce these documents by the September 12, 2022 deadline set in the Discovery Order. (Dkt. 42 at 20.) As noted above, the 71 new bills of lading ("BoLs") that WTT produced in July 2023 are materially the same as the 32 BoLs that it produced in April 2022, and relate to glove shipments that occurred before, in the midst of, and after, the dates of the 32 BoLs. (Koley Decl. ¶15.) WTT's shipping agent, Straight Forwarding, sent the shipping and customs documents for each transaction to WTT, so WTT unquestionably had the records. (Dkt. 146-2 at 2 (¶¶11-12).) Below is an excerpt of one such email, attaching the shipping and customs documents:

| From: | Alina.Sha@straightforwardinginc.com |
|---|---|
| Sent: | Thursday, January 14, 2021 5:22 PM |
| To: | jackii.chen@straightforwardinginc.com; serjan@worldtechtoys.com; aven.pian@straightforwardinginc.com; sophie@straightforwardinginc.com; kev@worldtechtoys.com; Shina@hobbytron.com; jackson.chen@straightforwardinginc.com |
| Subject: | [WORLD TRADING 23, INC][Ocean-OIM-20121837][OOLU2656909192][Container#BSIU9294156][ARRIVAL NOTICE FREIGHT INVOICE - ATESZ2101090] |
| Attachments: | ATESZ2101090.PDF; PL 20201229-2 gloves.xls; PI 20201229-2 Gloves.xls; Delivery Order - ATESZ2101090.pdf; 84A-0012744-2-7501.pdf; ARRIVAL NOTICE FREIGHT INVOICE - ATESZ2101090.pdf |

Please see AN and DO with invoice attached

ETA: 01/19

DELIVERY ORDER ATTACHED

TELEX RELEASED

CREDIT HOLD - PENDING

PLEASE DO NOT SUBMIT ENTRY

***PLEASE CONFIRM UPON RECEIPT***
THANK YOU

(*Id.* at Ex. A (ECF page 6 of 18).)

WTT's failure to timely produce shipping and customs documents also violates the Discovery Order with respect to RFP No. 3, which sought all documents and communications with Feida Toys. Among the shipping documents that are included in every glove transaction is a Packing List and Pro Forma invoice:

## SHENGFENG Toys Co.,Ltd

Address:Shengfeng,Jiangdong Chaozhou,Guangdong,China(Post code:515800)

Tel: 0086-768-85636250  Fax: 0086-768-85636250

### PACKING LIST

| | | | carton ssie(CM) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| SO:2656909192-1 | | CTN:BSIU9294156 | | SBAL:OOLQJB7666 | | | | | | | | | |
| size | Desc., | Pcs/Ctn | L | W | H | gw./ctn (Kg) | nw./ctn (Kg) | T. CTNS | T. QTY | CBM/CTN | T. CBM | T. GW (Kgs) | T. NW (KGS) | Shipping mark |
| M | Gloves | 1000 | 33.5 | 26.6 | 26.5 | 5.40 | 5.00 | 1663 | 1663000 | 0.024 | 39.270 | 8980.2 | 8315.0 | |
| L | Gloves | 1000 | 33.5 | 26.6 | 26.5 | 6.30 | 6.00 | 930 | 930000 | 0.024 | 21.961 | 5859.0 | 5580.0 | Shijiazhuang Hongray Group Co.,Ltd. |
| XL | Gloves | 1000 | 33.5 | 26.6 | 26.5 | 6.60 | 6.20 | 307 | 307000 | 0.024 | 7.250 | 2026.2 | 1903.4 | |
| | | | | | | | Total: | 2900 | 2900000 | | 68 | 16865 | 15798 | |

4883-5605-7233.6

## Shantou Chenghai FEIDA Toys Company (FODA factory)

Address:Tsian road,Chenghai,Shantou,Guangdong,China(Post code:515800)

Tel: 0086-764-86821680   Fax: 0086-764-86821680

### PROFORMA INVOICE

TO:world trading 23/Kev Kouyoumjian

Address:  24700 ave rockefeller valencia ca 91355,USA

Tel: 1-818-675-9001

CTN:BSIU9294156

P/INV.No.:  F 2020120929-2

Date:  23th. Dec. , 2020

| ITEM NO. | DESCRIPTION | Shipping mark | PACKING | EXW (USD) | Qty/Ctn (pcs) | CBM/CTN(m3) | CTNS | CBM | QTY | Amount |
|---|---|---|---|---|---|---|---|---|---|---|
| M | Gloves | Shi jiazhuang Hongray Group Co., Ltd. | box | 0.01 | 1000 | 0. 024 | 1663 | 39. 91 | 1663000 | US$16,630.00 |
| L | Gloves | | box | 0.01 | 1000 | 0. 024 | 930 | 22. 32 | 930000 | US$9,300.00 |
| XL | Gloves | | box | 0.01 | 1000 | 0. 024 | 307 | 7. 37 | 307000 | US$3,070.00 |
| | | | | | | customs+local charge: | | 1 | | US$130.00 |
| | | | | | | Total: | 2,900 | 69.60 | 2,900,001 | US$29,130.00 |

ETA date: 2020/12/30

Shipment date:

Payment: 100% TT in advance.

Term of price: EXW price

Dkt. 146-2, Exs. A-2, A-3 (ECF pages 10, 12 of 18).) "Straight Forwarding received all Packing Lists [and Invoices] from Elaine Dong [at Feida Toys]…, who routinely cc'ed Kevork Kouyoumjian, at kev@worldtechtoys.com on each communication." (*Id.* at ¶¶6, 7 (ECF page 2 of 18).) On both of these Feida documents, Hongray's name (highlighted) is shown on the shipping mark. Even though these documents were responsive to RFP No. 3, WTT did not produce them for the 103 transactions associated with Hongray's name until July 2023. (Koley Decl. ¶15.)

WTT has put forward a declaration from its Chinese supplier, Elaine Dong (of Feida Toys), dubiously claiming that references to "Hongray" in the shipping records are not accurate. (Dkt. 148-2 at ¶¶12-18.) While WTT might try to make such arguments at trial, that does not give WTT license to ignore the Discovery Order and fail to timely produce documents that, on their face, identify "Hongray" by name.

### 3.    WTT Failed To Provide Customer Information

The Discovery Order compelled WTT to produce documents responsive to Hongray's discovery requests seeking the names of WTT's customers for gloves associated with Hongray's name (RFP No. 26), and pricing information for those gloves (RFP No.

CASE NO. 5:21-CV-00972 FWS (SHKx)

HONGRAY SANCTIONS MOTION

4883-5605-7233.6

27). In response to the Discovery Order, WTT represented on September 12, 2022 that, with respect to RFP Nos. 26 and 27, it "has conducted a diligent search and has produced all non-privileged documents in their possession, custody, or control." (Dkt. 146-1 at ECF pages 104-05, 105 of 117.)

This statement was untrue when it was made. It was not until October 2023 – over a year after representing no such document existed – that WTT produced a detailed 15-page sales spreadsheet (WTT05626-5640), which included sales information for the transactions that even WTT claims are "at issue." Even then, the identity of the customers could not be determined from the indecipherable codes used in the spreadsheet, and partial customer identification was not provided until weeks later on October 27, 2023, 18 days before the close of supplemental discovery.  (Koley Decl. ¶3.)  As a consequence of these delays, Hongray has been effectively deprived of an opportunity to investigate these third parties and what they purchased from WTT.

### 4.    WTT Failed to Provide Information Concerning Its Profits and Expenses

Having represented in its September 12, 2022 response to the Discovery Order that it had completed its production of documents relating to the calculation of gross or net profits (RFP No. 35) and its costs and expenses (RFP No. 36), WTT cannot circumvent that Order now by producing payroll and lease records on November 5, 2023.

### B.    WTT Engaged In Spoliation As To Product Labeling Evidence

WTT's obligation to preserve evidence arose at least as early at Hongray's April 1, 2021 cease and desist letter,[5] yet Supplemental Discovery has revealed that WTT sold off a substantial portion of its inventory after that date, and after Hongray's June 2021 complaint, (Koley Decl. ¶4) without preserving any records of the labeling on the gloves that it sold. *See id.* ¶14, Ex. 3 at 196:23-199:2, 301:25-302:16; ¶22, Ex. 7 at 38:7-14; ¶23, Ex. 8 at 69:14-25, 75:2-11.)  This has prevented Hongray from being able to properly assess

---

[5] See, e.g., *Reinsdorf v. Skechers U.S.A.,* Inc., 296 F.R.D. 604, 625 (C.D. Cal. 2013).]

WTT's narrative about whether gloves sold after 4/2/2021 were labeled with Hongray's name.

### C.   WTT Continues To Withhold Communication With Its Supplier, Elaine Dong

Elaine Dong is a central figure in this case. She is the general manager of Feida Toys, the Chinese supplier of the accused counterfeit WTT products. (Dkt. 148-2 at ¶¶1-2.) Supplemental Discovery has revealed that WTT has been in possession of a remarkable roughly 830 individual text messages, WeChat messages, and emails with the Chinese supplier of the accused gloves, Elaine Dong of Feida Toys. As discussed in more detail in Hongray's concurrent Motion to Compel, WTT's ongoing withholding of almost all of these communications under a claim of work product and privilege is improper.

WTT failed to keep any records of its own that tracked the labeling of the gloves it was selling, and thus has no independent basis to refute the shipping records identifying 2.8 million boxes of gloves as purported being "Hongray" gloves.  WTT's sole "evidence" in support of its narrative that only about 900,000 boxes were labeled or marketed as from Hongray consists of a highly dubious affidavit from Elaine Dong, who now conveniently claims that the shipping records – which she was in charge of preparing pursuant to strict customs regulations – were false. (Dkt. 148-2, ¶¶14-17.) Mr. Kouyoumjian has also testified that Ms. Dong was to arrange for signatures to the fake "certifications" of authenticity for the gloves. (Koley Decl. ¶5.)

In response to Hongray's original discovery requests, WTT never articulated any basis for work product or privilege as to communications with Elaine Dong, waiving those objections. (*See*, *e.g.*, Dkt. 146-1 at ECF page 36-37 of 117) (failing to object on work product or attorney-client privilege grounds to communications with Feida Toys.)  WTT now has withheld communications with Ms. Dong on the theory that Ms. Dong was acting as an "agent" of WTT, and hence communications with her fall under work product and privilege protections, all while simultaneously relying on communications with Elaine Dong for the claim that only 900,000 boxes of gloves were labeled under Hongray's name

and for the claim that Elaine Dong helped secure "certifications" from Hongray's principals. (Koley Decl. ¶¶5, 25; see also Dkt. 148-2 ¶¶17, 18, 19 [sic].)  However, the law does not support extending such sweeping protections to an independent, unrepresented, non-party and important fact witness. *Gonzales v. United States*, No. C-08-03189 SBA(EDL), 2010 WL 1838948, at *3 (N.D. Cal. May 4, 2010) (holding communications not protected by work product doctrine where the supposed "agent" was "a fact witness which shows that he is not a representative of Plaintiff's counsel for purposes of the work product doctrine" and where "Plaintiff has not shown that Mr. Lemons was hired as an agent or investigator for this litigation pursuant to Kovel.") Similarly here, WTT have made Elaine Dong a critical fact witness and WTT has not hired Ms. Dong as an agent for this litigation.

Nor does the law permit WTT to "wield the attorney-client privilege and work product doctrine as both a sword and a shield." *Madrigal v. Allstate Indem. Co*., No. CV 14-4242 SS, 2015 WL 12748277, at *4 (C.D. Cal. Nov. 5, 2015). Here, WTT is trying to rely on Ms. Dong to exculpate itself from liability, while simultaneously preventing Hongray from seeing WTT's communications with her.

For that portion of the Elaine Dong communications that WTT logged, the privilege logs lack sufficient detail to assess the claim of privilege. (Koley Decl. ¶¶26-27, Ex. 9,10.) Thus, WTT's claim of work product fails. Fed. R. Civ. P. 26(b)(5); *see also In re Grand Jury Investigation*, 974 F.2d 1068, 1071 (9th Cir. 1992); *Ramirez v. County of L.A.*, 231 F.R.D. 407, 410 (C.D. Cal. 2005) (citing *Peat, Marwick, Mitchell & Co. v. West*, 748 F.2d 540, 542 (10th Cir.1984) (per curiam ), cert. dismissed, 469 U.S. 1199, 105 S.Ct. 983, 83 L.Ed.2d 984 (1985) (privilege waived when defendant did not make a timely and sufficient showing that the documents were protected by privilege).

### D.    WTT Should Be Sanctioned

#### 1.    Prejudice To Hongray

Hongray has been prejudiced by WTT's systematic violations of the Discovery Order. If WTT had produced the withheld records to Hongray on September 12, 2022, then

discovery could have progressed properly, expert reports would have been prepared based on a complete record, and this case could have proceeded to trial as originally scheduled.

But, none of that happened. Instead, WTT maintained that responsive documents either did not exist or had already been produced, which led Hongray to engage in months of third-party discovery and motion practice to try and unearth information about WTT's sales of counterfeit gloves that WTT had all along. But for the fortuitous fact that Hongray learned about the *Bur-Tex* lawsuit against WTT in November 2022, and Straight Forwarding's change of heart to provide shipping documents to Hongray after months of intransigence, WTT may have gotten away with its violations of the Discovery Order. Even with that third party information, Hongray incurred significant time and expense having to brief all these issues to the Court and work to secure supplemental discovery.

Furthermore, WTT's failure to produce documents in response to Hongray's discovery requests and in violation of the Discovery Order, deprived Hongray of critical evidence for use during its depositions during original fact discovery. WTT's February 16, 2023 deposition testimony that no one cared about Hongray and that it was not aware of Hongray prior to the filing of the lawsuit indicates "a highly culpable desire to deliberately block [Hongray] from obtaining relevant information." *Blumenthal Distrib., Inc. v. Herman Miller, Inc.*, No. EDCV141926JAKSPX, 2016 WL 6609208, at *27 (C.D. Cal. July 12, 2016), *report and recommendation adopted*, No. EDCV1401926JAKSPX, 2016 WL 6901696 (C.D. Cal. Sept. 2, 2016). Indeed, WTT's supplemental discovery realized over 3244 documents from WTT's email server and 613 text messages from Kouyoumjian's phone that contained the term "Hongray" from as early as June 2020. (Koley Decl. ¶¶12, 24.) WTT continues to withhold hundreds of text messages. (*See id.* ¶¶26-27, Ex. 9, 10.)

Additionally, Hongray was forced to engage in needless and costly motion practice premised on the supposed absence of evidence concerning sale of "Hongray" gloves. In its January 26, 2023 motion for summary judgment, WTT asserted that all of Hongray's claims failed because it had "not presented any evidence that the [estimated 1 million boxes

of ] Gloves were not produced by and/or sourced from" Hongray. (Dkt. 54 at 8 (ECF page 13 of 17).) But, the dearth of evidence was purely a function of WTT's failure to comply with the Discovery Order and failure to meaningfully participate in discovery. The 103 BoLs and other shipping/customs documents (RFP Nos. 43 and 3) contradicted WTT's assertions about the quantity of counterfeit gloves at issue, the dates those gloves were shipped, and its sworn testimony that it did not care or know about Hongray prior to this lawsuit. The sales spreadsheet (RFP Nos. 26 and 27) also showed that those gloves turned a profit.

Then on May 11, 2023, WTT filed a motion in limine to preclude Hongray from offering evidence or testimony about WTT's profits because Hongray had failed to discover any evidence refuting the fact that WTT "did not profit from the sale of the at-issue gloves" and had actually sustained a significant loss. (Dkt. 97 at 7-8.)

In both instances, WTT tried to use its own non-compliance with the Discovery Order as a sword to end or severely limit Hongray's action. That Hongray received certain responsive documents in the supplemental discovery period does not cure Hongray's prejudice as "[b]elated compliance with discovery orders does not preclude the imposition of sanctions," *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (per curiam); *accord N. Am. Watch Corp. v. Princess Ermine Jewels*, 786 F.2d 1447, 1451 (9th Cir. 1986). WTT's "repeated failure to provide documents and information in a timely fashion prejudiced the ability of [Hongray] to prepare [its] case for trial." *Herman Miller*, 2016 WL 6609208, at *1.

### 2.    Hongray's Requested Sanctions

Whether awarded pursuant to Rule 37, or pursuant to the Court's civil contempt powers, or the Court's inherent authority – or based on all of the foregoing premises – Hongray requests sanctions against WTT as follows:

First, WTT should be required to pay Hongray's attorneys' fees and costs associated with discovery and related motion practice from September 12, 2022—the deadline in the Court's Discovery Order—until the commencement of the Supplemental Discovery period.

As explained above, most of the fees and expenses that Hongray incurred during those twelve plus months would not have been necessary if WTT had complied with the Discovery Order or engaged in good faith discovery efforts.

Second, WTT should be required to pay for that portion of Hongray's fees and costs that relate to opposing WTT's summary judgment motion and motion in limine arguments that were premised on a supposed absence of evidence of "Hongray" sales, including the expenses associated with Hongray's Rule 56(d) / Rule 16(b) Motion seeking supplemental discovery.

Third, WTT should be precluded from offering any testimony from Elaine Dong at trial. WTT first withheld hundreds of communications with Ms. Dong during the original discovery period, and has now continued to withhold the lion's share of those communications in Supplemental Discovery under an inappropriate claim of work product/privilege. Hongray has at this point exhausted all reasonable attempts to obtain this discovery and has been improperly stonewalled. WTT cannot be allowed to use the Elaine Dong evidence as both a sword and a shield, on the one hand claiming that she alone can address the labeling and purported authenticity of the gloves, while blocking essentially all discovery about communications with her. *Columbia Pictures Television, Inc. v. Krypton Broad. of Birmingham, Inc.*, 259 F.3d 1186, 1196 (9th Cir. 2001) ("where the party claiming privilege during discovery wants to testify at the time of trial, the court may ban that party from testifying on the matters claimed to be privileged.").

Fourth, based on its violation of the Discovery Order with respect to RFP Nos. 35 and 36, WTT should be barred from introducing any testimony or evidence at trial relating to its costs or expenses, or the calculation of its gross or net profits, related to counterfeit glove sales, which was not produced to Hongray on or before September 12, 2022.

Fifth, in view of WTT's failure to maintain records of the labeling of the gloves after the duty to preserve evidence arose, Hongray requests an adverse inference jury instruction informing the jury that they may infer from WTT's actions that WTT was trying to avoid keeping records that might contradict its narrative as to how the gloves were labeled, and

whether they were counterfeit. *Herman Miller*, 2016 WL 6609208, at *25 (awarding adverse inference jury instruction where defendant acted with gross negligence and a conscious disregard towards its obligations resulting in spoliated evidence).

Finally, Hongray seeks its costs and fees in bringing the present motion, including expenses relating to developing the arguments for this motion.

### 3.    Hongray Requests A Briefing Schedule As To The Proper Amount Of The Sanctions

If the Court finds as a threshold matter that above-requested sanctions are warranted, Hongray then requests that the Court set a briefing schedule to set the proper amount of attorneys fees and costs that should be awarded. *Herman Miller*, 2016 WL 6609208, at *27 (awarding monetary sanctions for discovery misconduct and ordering a briefing schedule where movant submits detailed calculations within fourteen days of any order accepting the Report and Recommendation).

## IV.   **CONCLUSION**

For the reasons stated, Hongray's motion for sanctions should be granted.

CASE NO. 5:21-CV-00972 FWS (SHKx)
HONGRAY SANCTIONS MOTION

4883-5605-7233.6

Dated: November 24, 2023

**FOLEY & LARDNER LLP**

Victor de Gyarfas
Jean-Paul Ciardullo
Naikang Tsao
Ashley M. Koley
Laura Moedano

*/s/ Jean-Paul Ciardullo*
Jean-Paul Ciardullo

Attorneys for Plaintiff SHIJIAZHUANG HONGRAY GROUP

## WORD COUNT CERTIFICATION

Counsel hereby certifies that the Word Count function of Microsoft Word reports that the text of the foregoing memorandum is less than 7,000 words.

*/s/ Jean-Paul Ciardullo*
Jean-Paul Ciardullo