1  Aaron M. McKown (SBN 208781)
     aaron@mckownbailey.com
2  William P. Cassidy, Jr. (*admitted pro hac vice*)
     wcassidy@mckownbailey.com
3  **McKOWN BAILEY**
   520 Newport Center Drive, Suite 470
4  Newport Beach, CA 92660
   Telephone: 949-858-3200
5
   Attorneys for Defendants WORLD
6  TRADING 23, INC. and WORLD TECH
   TOYS, INC.
7

8              **UNITED STATES DISTRICT COURT**

9              **CENTRAL DISTRICT OF CALIFORNIA**

10                  **SOUTHERN DIVISION**

11  SHIJIAZHUANG HONGRAY GROUP,          Case No. 5:21-cv-00972-FWS-SHK
    a Chinese Corporation,
12                                       **DEFENDANTS WORLD TRADING**
                                         **23, INC. AND WORLD TECH TOYS,**
13                        Plaintiff,     **INC.'S NOTICE OF MOTION AND**
                                         **MOTION FOR SUMMARY**
14             vs.                       **JUDGMENT OR, ALTERNATIVELY,**
                                         **PARTIAL SUMMARY JUDGMENT**
15  WORLD TRADING 23 INC., a
    California Corporation, and WORLD
16  TECH TOYS, a California Corporation,
17                        Defendants.
18                                       **Date:  February 1, 2024**
                                         **Time: 10:00 a.m.**
19                                       **Dept:  10D**
20
                                         Pretrial Conf. Date: 04/18/2024
21                                       Trial Date: 05/14/2024
22

23

24

25

26

27

28

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on February 1, 2024 at 10:00 a.m., or as soon thereafter as counsel may be heard in Courtroom 10D of the United States District Court for the Central District of California, Southern District, located at 411 West 4th Street, Santa Ana, California 92701, pursuant to Rule 56 of Federal Rules of Civil Procedure and Local Rule 56-1, defendants Word Trading 23, Inc. ("WT23") and World Tech Toys, Inc. ("WTT") (collectively hereafter as the "WT Parties") hereby move the Court for an order for summary judgment or, alternatively, partial summary judgment as to Plaintiff Shijiazhuang Hongray Group's ("Plaintiff") First Amended Complaint (the "FAC") on the following issues and causes of action:

1.    Plaintiff fails to state a claim for counterfeiting and Plaintiff has no entitlement to statutory remedies for counterfeiting because Plaintiff does not have a trademark registered with the USPTO;

2.    Plaintiff's false designation of origin claim fails because the origin of the gloves at issue is accurately stated;

3.    Plaintiff's false advertising claim fails because there is no evidence of false statements having a material impact on the marketplace;

4.    Plaintiff's false advertising claim fails because Plaintiff cannot show that Defendants' actions were the proximate cause of Plaintiff's harm nor has Plaintiff demonstrated any cognizable harm proximately caused by Defendants' alleged actions;

5.    Plaintiff does not have standing to assert claims based on 510(k) numbers of its subsidiaries;

6.    Plaintiff has not suffered any actual damages on any claims asserted in the FAC;

7.    Plaintiff is not entitled to a disgorgement of lost profits from WT Parties in connection with this action as the WT Parties has not received any profits as

a result of the transactions at issue and no such remedy is available under California Business & Professions Code sections 17200 et seq.; and

8.      Plaintiff is not entitled to injunctive relief as there is no reasonable threat of ongoing and/or future harm.

This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declarations of Kevork Kouyoumjian, Elaine Dong, Layla Hollender, Michael O'Brien, Yichang Chen, and Aaron McKown filed concurrently herewith, the Statement of Uncontroverted Material Facts ("SUMF") and Conclusions of Law, and Request for Judicial Notice filed concurrently herewith, the proposed order lodged and served concurrently herewith, all pleadings, papers, records, and documents on file in this action, and such oral and documentary evidence as may be presented at or before the hearing on the Motion.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which concluded on December 11, 2023. *See* Declaration of Aaron McKown at ¶ 2, Ex. A.

DATED:  December 29, 2023          **McKOWN BAILEY**


                                   */s/Aaron M. McKown*
                                   Aaron M. McKown
                                   William P. Cassidy, Jr.
                                   Michael O'Brien
                                   Attorneys for Defendants
                                   WORLD TRADING 23, INC. and
                                   WORLD TECH TOYS, INC.

# TABLE OF CONTENTS

I.    **INTRODUCTION** ........................................................................ 1

II.    **UNDISPUTED MATERIAL FACTS** .......................................... 2

     A.    **PLAINTIFF** ............................................................... 2

     B.    **THE WT PARTIES** .................................................... 3

     C.    **THE WT PARTIES' ACQUISITION OF THE HONGRAY LOT** ...... 4

     D.    **PLAINTIFF ADMITS THAT IT SOLD GENUINE GLOVES TO HKMI AND THAT HKMI PAID PLAINTIFF NEARLY $1 MILLION FOR GENUINE HONGRAY GLOVES** ............................ 6

     E.    **PLAINTIFF'S EXPERT EXAMINED THE GLOVES FROM THE HONGRAY LOT AND DID NOT DISPUTE THEIR GENUINENESS** ...................................................... 7

     F.    **PLAINTIFF'S EXPERT WITHDREW OPINIONS REGARDING ACTUAL DAMAGES** ............................... 7

     G.    **THE WT PARTIES RECEIVED ADDITIONAL CONFIRMATION REGARDING THE GENUINENESS OF THE HONGRAY LOT** ................................................. 7

     H.    **THE HONGRAY LOT WAS THE ONLY TRANSACTION INVOLVING PLAINTIFF AND THE WT PARTIES HAVE CEASED ALL GLOVE SALES AFTER PANDEMIC WANED** ...... 8

III.    **RELEVANT PROCEDURAL HISTORY** ................................ 9

IV.    **ARGUMENT** ................................................................... 10

     A.    **STANDARD** ............................................................. 10

     B.    **THE WT PARTES ARE ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFF'S COUNTERFEITING CLAIM AND REQUEST FOR COUNTERFEITING REMEDIES** ............... 11

     C.    **PLAINTIFF'S LANHAM ACT CLAIMS FAIL BECAUSE PLAINTIFF CANNOT DEMONSTRATE ENTITLEMENT TO**

ANY RELIEF ............................................................................... 12

1.    *Plaintiff Did Not Suffer Any Damages Proximately*
*Caused by the Alleged False Advertising or False*
*Designation of Origin* .................................................... 12

2.    *There Are No Profits to Disgorge As a Matter of Law* ................ 14

3.    *Injunctive Relief Is Not Appropriate Because Plaintiff*
*Cannot Demonstrate a Likelihood of Continual or*
*Future Harm* ................................................................. 16

D.    **PLAINTIFF'S FALSE DESIGNATION OF ORIGIN CLAIM**
**FAILS BECAUSE THE ORIGIN OF THE GOODS IS**
**ACCURATELY STATED** ........................................................ 17

E.    **PLAINTIFF'S FALSE ADVERTISING CLAIM FURTHER**
**FAILS AS A MATTER OF LAW** ............................................. 18

1.    *No Evidence to Demonstrate that the Alleged*
*Advertising Was False* .................................................... 18

2.    *The Evidence Conclusively Demonstrates that the*
*Alleged False Advertising Was Not Material* .......................... 18

F.    **PLAINTIFF DOES NOT HAVE STANDING TO ASSERT**
**MARKS OF OTHERS** ........................................................... 19

G.    **PLAINTIFF'S UCL CLAIM FAILS BECAUSE NO REMEDY IS**
**AVAILABLE** ..................................................................... 21

1.    *Disgorgement of Profits Is Not A Remedy Under the*
*UCL and No Factual Basis for Restitution Exists* ...................... 21

2.    *Injunctive Relief Is Not Available As a Remedy* ...................... 22

V.    **CONCLUSION** ........................................................................ 23

# TABLE OF AUTHORITIES

**CASES**

*Am. Circuit Breaker Corp. v. Or. Breakers, Inc.*, 406 F.3d 577 (9th Cir. 2005) .............19

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)...........................................10, 11, 16

*Bates v. UPS*, 511 F.3d 974 (9th Cir. 2007) ......................................................17

Better Care Plastic Technology Co., Ltd. v. Gredale, LLC, No. 5:21-cv-00216-JWH-SPx

  (C.D. Cal. 2021) ....................................................................................22

*Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) .............................................10

*Chung v. City of L.A.*, 406 Fed. Appx. 207 (9th Cir. Dec. 17, 2010) ..................... 19, 20

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) ...............................................17

*Clark v. Super. Ct.*, 50 Cal. 4th 605 (2010) ......................................................23

*Hansen Bev. Co. v. Vital Pharm., Inc.*, No. 08-CV-1545-IEG (POR), 2010 U.S. Dist.

  LEXIS 79218 (S.D. Cal. Aug. 3, 2010) .......................................................12

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, No.

  SACV1701613CJCDFMX, 2023 WL 2652855, at *5 (C.D. Cal. Mar. 13, 2023) ........17

Krauser v. BioHorizons, Inc., 903 F. Supp. 2d 1337 (S.D. Fla. 2012)...........................21

*Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310 (2011) ...........................................24

*Lanard Toys, Ltd. v. Novelty, Inc.*, 511 F. Supp. 2d 1020 (C.D. Cal. 2007) ...................23

*Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400 (9th Cir. 1993)......................................13

*Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 310 F. Supp. 3d 1089 (S.D. Cal. 2018)

  ...........................................................................................................21

*O'Shea v. Littleton*, 414 U.S. 488 (1974)........................................................17

Playvision Labs, Inc. v. Nintendo of Am., Inc., No. C14-05365 CRB, 2015 WL

  12941892 (N.D. Cal. May 18, 2015)............................................................12

*Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020)................................16

*Shersher v. Super. Ct.*, 154 Cal. App. 4th 1491 (2007) .......................................23

*Skydive Ariz., Inc., v. Quattrocchi*, 673 F.3d 1105 (9th Cir. 2012) ..............................20

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134 (9th Cir. 1997) .................20, 21

*Stevo Design, Inc. v. SBR Mktg.*, 919 F. Supp. 2d 1112 (D. Nev. 2013)............................22

*ThermoLife Int'l, LLC v. BPI Sports, LLC,* No. 21-15339, 2022 WL 612669, at *2-3 (9th Cir. Mar. 2, 2022) ............................................................................................14

*Upper Deck Co. v. Flores*, 569 F. Supp. 3d 1050 (S.D. Cal. 2021) ...........................13, 18

*Yuga Labs, Inc. v. Ripps*, No. CV 22-4355-JFW(JEMX), 2023 WL 7089922, at *10 (C.D. Cal. Oct. 25, 2023)........................................................................................16

*Zamfir v. Casperlabs*, LLC, 528 F. Supp. 3d 1136 (S.D. Cal. 2021) ...............................18

**STATUTES**

15 U.S.C. § 1125(a) ...............................................................................................9, 13

15 U.S.C. §1116 .........................................................................................................11

Cal. Bus. & Prof. Code § 17200 ........................................................................9, 23

Cal. Bus. & Prof. Code § 17204 ...............................................................................23

Fed. R. Civ. P. 56(a).................................................................................................10

Fed. R. Civ. P. 30(b)(6)............................................................................................22

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

The undisputed facts establish that regardless of how Plaintiff Shijiazhuang Hongray Group ("Hongray") attempts to skew and massage the record, Defendants World Tech Toys, Inc. and World Trading 23, Inc. (collectively, the "WT Parties") are entitled to summary judgment on each of the claims asserted against them.

The WT Parties' entitlement to summary judgment has been essentially conceded by Plaintiff with respect to three of its claims.  First, Plaintiff's counterfeiting claims and request for counterfeiting remedies fail as a matter of law.  Fundamental to a claim for counterfeiting is that Plaintiff have a mark registered with the USPTO.  Plaintiff has no such registration.  As such, the WT Parties are entitled to judgment as to Plaintiff's repeated claim that the WT Parties sold counterfeit goods entitlement Plaintiff to various counterfeiting remedies.  Second, Plaintiff's request for "disgorgement of profits and/or ill gotten" gains under California's unfair competition law ("UCL") is barred as a matter of law as the law is well-settled that no such remedy exists under the statute.  Third, the WT Parties are entitled to summary judgment as to Plaintiff's restitution claim under the UCL because it is undisputed that the WT Partes are not in possession of Plaintiff's money or property.

Further fatal to Plaintiff's Lanham Act claims is the undisputed fact that Plaintiff cannot demonstrate entitlement to any available remedy.  Plaintiff concedes that it has not suffered any actual damages proximately caused by the WT Parties' alleged misconduct. Plaintiff did not lose any sales and in fact, admitted that it could not meet the demand for its products due to its inability to secure sufficient shipping containers to the U.S.  Plaintiff has not suffered any reputational harm, and, in fact, its own expert confirmed that merchants have remained happy to do business with Plaintiff.  Plaintiff did not engage in any corrective advertising as conceded by Plaintiff's expert who withdrew all such opinions.  As such, the WT Parties are entitled to summary judgment on Plaintiff's claim of actual damages under the Lanham Act.

The WT Parties are also entitled to summary judgment on Plaintiff's claim for disgorgement of profits under the Lanham Act. The WT Parties' accounting and financial records, combined with the testimony of its purchasing agent and lender, confirm that the WT Parties made no profits from their sale of either the Hongray lot they purchased or on their overall glove sales. Moreover, even if Plaintiff could create a genuine issue of disputed facts regarding whether the WT Parties profited from the sale of gloves, the undisputed facts confirm that the WT Parties either purchased genuine Hongray gloves (as partially admitted by Plaintiff) or they were duped by persons who had access to Plaintiff's email servers. Either way, the undisputed evidence demonstrates that the WT Parties neither acted willfully nor with the *mens rea* necessary to warrant the disgorgement of profits under the Lanham Act as a matter of law.

The undisputed facts also preclude permanent injunctive relief as to all of Plaintiff's claims. It is undisputed that the WT Parties are toy companies. They have been toy companies for nearly two decades. Due to the unprecedented demand caused the pandemic for personal protective equipment ("PPE"), including gloves, the WT Parties briefly dabbled in the purchase and sale of PPE – an temporary experiment that cost them millions of dollars in losses. Once the pandemic waned and the historical demand for PPE came to an end, the WT Parties ceased selling PPE, including gloves, and went back to being full-time toy companies. The pandemic is over. The parties are not competitors. There is no threat of future harm. Plaintiff is not entitled to injunctive relief as a matter of law.

The WT Parties respectfully request that the Court grant them summary judgment on each of the claims asserted.

## II.    UNDISPUTED MATERIAL FACTS

### A.    Plaintiff

Plaintiff owns 100% of Hongze Plastic Technology, Co., Ltd. ("Hongze"), Better Care Plastic Technology CP, Limited ("Better Care"), Grand Work Plastic Products Co. Ltd. ("Grand Work"), and Hongray (USA) Medical Products, Inc. SUMF #1.

Better Care and Grand Work make nitrile gloves; Hongze Plastic makes vinyl gloves

and nitrile vinyl blend gloves.  SUMF #2. Better Care's 510(k) number K182600 and Grand Work's 510(k) number K051662 refer to nitrile gloves.  SUMF #3.  Hongze's 510(k) numbers K101135 and K101137 refer to vinyl gloves.  SUMF #4.  None of the 510(k) registrations are in the name of Plaintiff nor does Plaintiff own any of the 510(k) registrations in the name of Better Care, Grand Works, or Hongze.  SUMF #5.

Hongray USA is an import company that connects American customers with Plaintiff and its subsidiaries.  SUMF #6.  Guixi Liu is the majority shareholder and President of Hongray; he is also the father of Jie Liu who served as Plaintiff's Corporate Representative at the 30(b)(6) Deposition.  SUMF #7.  Across Plaintiff and its subsidiaries businesses, 60% of the gloves sold are nitrile, 30% are vinyl, and 10% are a nitrile vinyl blend.  SUMF #8.  Across Plaintiff and its subsidiaries, 95% of gloves are sold outside of China and 5% are sold within China.  SUMF #9.

During the Covid-19 Pandemic, supply chains were extremely disrupted and there was an extreme demand for shipping containers going from China to the United States with container space needing to be ordered well in advance and shipping information having to be provided weeks before the actual shipping date.  SUMF #10.  During those turbulent times, Hongray did not have access to the shipping capacity in China to meet the demand for gloves in the United States.  SUMF #11.

There is no registration for HONGRAY on the principal register of the USPTO nor has Plaintiff alleged any.  SUMF #12.  Plaintiff admitted that gloves from Hongray are not counterfeit regardless of who sells them.  SUMF #13.

## B.  The WT Parties

The WT Parties are toy companies who only became involved in the sale of disposable gloves during the height of the pandemic, which has now passed.  SUMF #14. The WT Parties sold gloves under the brand PPE-AID in a custom-made box regardless of who manufactured them.  SUMF #15.  The WT Parties lost millions of dollars regarding their temporary foray into PPE resulting in their ceasing all PPE sales, including gloves, in 2022.  SUMF #16.

With respect to the disposable gloves, there were numerous manufacturers from whom WT Parties were sourcing gloves in 2020 and 2021 other than Hongray. SUMF #17. The vast majority of gloves imported by the WT Parties were not manufactured by Hongray. SUMF #18. These other glove manufacturers utilized by the WT Parties for supplying gloves included: Shandong Hengchang Medical Technology Co., Ltd (based in Zibo City; Shangdong Province, China), Hebei Handform Medical Products Co, Ltd. (based in Xingtai; Hebei Province, China), and Hubei Wanli Protective Products Co., Ltd. (based in Xiantao, Hubei, China). SUMF #19.

In total, the WT Parties paid $22,318,339 for 2,795,829 boxes of all gloves they imported. SUMF #20. With respect to the sale of these gloves, the WT Parties incurred transportation/shipping costs in the amount of $723,294 thereby bringing its total cost to $23,041,633 (without storage or warehousing). SUMF #21.

The WT Parties sold 2,333,493 boxes of gloves for $22,189,457, the bulk of which were not sold as Hongray gloves. SUMF #22. The balance of the gloves were taken by M2M and distributed in Mexico, however, M2M admitted during deposition that it never paid the WT Parties for those gloves. SUMF #23.

Excluding storage and warehousing expense, the WT Parties suffered a loss of $852,176 on the sale of all gloves. SUMF #24.

## C.    The WT Parties' Acquisition of the Hongray Lot

The WT Parties along with Win Partners, LLC ("Win") purchased 866,450 boxes of Hongray gloves (the "Hongray Lot") from Hebei Kuangyang Medical Instrument Sales Co., Ltd. ("HKMI") through its purchasing agent Feida Toys ("Feida"). SUMF #25. There are 100 gloves in each box and ten boxes in a carton. SUMF #26. Of the 866,450 boxes of gloves comprising the Hongray Lot, WTT purchased and owned 442,721 boxes and Win purchased and owned 423,729 boxes. SUMF #27. The WT Parties were informed that HKMI obtained the gloves at issue from the domestic Chinese market, including from Hongray's subsidiary, Hongze. SUMF #28. The Hongray Lot was shipped to the United States in PPE-AID boxes that included the phrases "Manufacturer Shijiazhuang Hongray

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

Group Co. Ltd." and "Nitrile Gloves."  SUMF #29.

The WT Parties only imported 32 shipping containers of Hongray gloves, which totaled 866,450 boxes.  SUMF #30.  Due to clerical mistakes on shipping paperwork, the WT Parties' long-time buying agent in China (Elaine Dong) did not change the manufacturer name as that being Hongray, whose gloves were going to be in the original shipping containers ordered for the WT Parties but were delayed.  SUMF #31.  Given staffing issues, extreme limited space of shipping containers, and the speed at which shipments needed to be processed during the pandemic, Ms. Dong used Hongray's name on these shipments already reserved and filled the containers with gloves from other manufacturers.  SUMF #32.  Ms. Dong continued to do the same on future orders as a shipping shortcut needed to keep up with the demand for PPE during the height of the COVID pandemic, which resulted in the appearance of more boxes of Hongray gloves being imported by the WT Parties than actually were imported.  SUMF #33.

The WT Parties paid a total amount of $10.6 million for the Hongray Lot of gloves purchased from HKMI.  SUMF #34.  Of the total amount paid by WT Parties for the Hongray Lot, $3.6 million came from its lender, which paid Feida Toys directly.  SUMF #35.  Of the total amount paid by WT Parties, $5 million came from Win for its portion of the Hongray Lot and $2 million came directly from the WT Parties.  SUMF #36.  Although Feida provided shipping documents for the Hongray Lot (and other non-Hongray gloves) which indicate the cost of goods was $1 per box, this was not the amount WT Parties actually paid for the Hongray Lot or for any other gloves.  SUMF #37.  Because there were no tariffs on any of the gloves imported due to COVID era regulations, the amount listed was of no importance at that time.  SUMF #38

The WT Parties' portion of the Hongray Lot did not leave the WT Parties' possession until a third party, Mind 2 Market Product Development LLC ("M2M"), agreed to purchase those items at a substantially reduced price as set forth in the WT Parties' Invoice No. 997867.  SUMF #39.  Even though M2M picked up the WT Parties' portion of the Hongray Lot, M2M did not pay for any of the gloves it picked up.  SUMF #40.

M2M made a total of two payments directly to the WT Parties – one for $380,000 and one for $17,157.64. SUMF #41. Both payments made by M2M directly to the WT Parties were for an earlier transaction with the WT Parties pursuant to the WT Parties' Invoice 997837. SUMF #42. The WT Parties' Invoice No. 997837 did not involve the Hongray Lot or any product from Plaintiff. SUMF #43. The transaction for the WT Parties' Invoice No. 997837, involved an attorney named Roberto Villasante, who acted as the paymaster for the sale and who produced the WT Parties' Invoice No. 997837 directly from his files and designated his Bates label "SHG_RV Response-00083." SUMF #44. Mr. Villasante testified that he did not even have a copy of the WT Parties' Invoice No. 997867 (for the Hongray Lot transaction) in his files and had no idea whether the gloves at issue in his transaction were manufactured by Hongray. SUMF #45.

M2M was aware that that gloves they were buying were vinyl or blends based upon the pricing of gloves. SUMF #46. M2M was not aware that the gloves they agreed to purchase from the WT Parties were made by Plaintiff or were being sold as Hongray gloves. SUMF #47. M2M did not care who manufactured the gloves that they agreed to purchase from the WT Parties. SUMF #48. Other third parties who acted as independent brokers sourcing gloves during the pandemic also confirmed that they too had clients that did not care who manufactured gloves as they "needed gloves during the pandemic, and they were desperate." SUMF #49. This same witness (found and deposed by Plaintiff), stated she did not even know Hongray was a glove manufacturer at the start of the pandemic. SUMF #50.

The WT Parties made no profit from any transaction relating to the Hongray Lot, but instead, sustained substantial losses. SUMF #51. Indeed, the WT Parties currently owe in excess of $6 million on the loan they received from their lender to purchase the Hongray Lot. SUMF #52.

### D.    Plaintiff Admits that It Sold Genuine Gloves to HKMI and that HKMI Paid Plaintiff Nearly $1 Million for Genuine Hongray Gloves

Plaintiff admits that it sold at least 82,000 100-count boxes of Hongray gloves to

HKMI between December 2020 and March 2021.  SUMF #53.  Between December 8, 2020 – February 3, 2021, HKMI paid 8.1 million RMB for gloves from Hongze.  SUMF #54. Based on February 2021 exchange rates, the 8.1 million RMB that HKMI paid for gloves from Hongze equaled $870,967 U.S. Dollars.[1]  SUMF #55.

### E.    Plaintiff's Expert Examined the Gloves from the Hongray Lot and Did Not Dispute Their Genuineness

Plaintiff's expert (Michael Dimitriou, Ph.D.) examined gloves from the Hongray Lot and did not dispute that Hongray/Hongze made the gloves.  SUMF #56.  Neither Plaintiff nor its expert Dr. Dimitriou ever determined that the gloves were not from Plaintiff or Hongze.  SUMF #57.

### F.    Plaintiff's Expert Withdrew Opinions Regarding Actual Damages

Plaintiff's accounting expert, Stacy Kinsel, testified that she had no evidence of corrective advertising to support the findings asserting the same in her original expert report.  SUMF #58.  Samples of corrective advertising were not provided by Ms. Kinsel in her original report as testified that she hoped to supplement her report with this information. SUMF #59.  Instead, Ms. Kinsel produced her Supplemental Expert Report on November 30, 2023 in which she withdrew all of her opinions on corrective advertising.  SUMF #60.

To date, Plaintiff has produced no evidence demonstrating that it lost any sales or that it suffered any reputation harm proximately caused by the WT Parties.  SUMF #61. Indeed, Plaintiff's own purported industry expert, Allen Ehrlich, admitted that merchants were, and continue to be, happy to do business with Plaintiff.  SUMF #62.

### G.    The WT Parties Received Additional Confirmation Regarding the Genuineness of the Hongray Lot

On April 1, 2021, Plaintiff sent the WT Parties a cease and desist letter in which Plaintiff claimed that the WT Parties were selling counterfeit Hongray gloves.  SUMF #63.

---

[1]    If HKMI paid $1 per box as Plaintiff claims, then that means HKMI actually purchased 870,000 boxes from Plaintiff – nearly the exact amount contained within the Hongray Lot.

The WT Parties never received any warnings, limitation, and/or other restrictions from Plaintiff, Hongze, or HKMI regarding the distribution and/or sales of the Hongray Lot prior to April 1, 2021.  SUMF #64.  Puzzled by the April 1, 2021 letter, the WT Parties began reaching out to HKMI and Hongze in China to determine the legitimacy of the claims being made.  SUMF #65.  During the WT Parties' investigation, the WT Parties received oral and written statements from individuals who they believed to be Hongze employees affirming the authenticity of the transactions and that the goods purchased by WT Parties were in fact genuine Hongze/Hongray products.  SUMF #66.

As part of their investigation, the WT Parties were instructed by these Hongze employees to reached out to Plaintiff to authenticate the Hongray Lot.  SUMF #67.  Accordingly, the WT Parties sent an email to Plaintiff's official email address listed on its website – sales@hongray.com.cn –  from a Chinese email account – wt98721@sohu.com.  SUMF #68.  The WT Parties then received a response to their email from any email account purporting to be sales@hongray.com.cn in which the sender confirmed the genuineness of the Hongray Lot.  SUMF #69.

Plaintiff admitted that it received the WT Parties' email, but Plaintiff's expert claimed that the response email was not found on Plaintiff's server.  SUMF #70.  Plaintiff, however, never provided the WT Parties, Plaintiff's 30(b)(6) witness, or even its own expert (Daniel Regard) the opportunity to review their email server.  SUMF #71.  In fact, Plaintiff's computer expert not only failed to inspect Hongray's email server, but he did not speak with anyone at Hongray regarding its email servers.  SUMF #72.  Instead, Plaintiff's computer expert based his opinion that the response email from Plaintiff was not from Plaintiff's server simply on statements provided to him by Hongray's attorneys.  SUMF #73.

## H.  The Hongray Lot Was the Only Transaction Involving Plaintiff and The WT Parties Have Ceased All Glove Sales After Pandemic Waned

The only transaction that the WT Parties ever had with HKMI is the one relating to the Hongray Lot at issue in this action.  SUMF #74.  The Hongray Lot is the only product

that the WT Parties have ever represented was sourced from Plaintiff or Hongze.  SUMF #75.

Plaintiff has placed the WT Parties, the WT Parties' Chinese buyer (Feida Toys), and HKMI on a blacklist of alleged distributors of counterfeit/fake Hongray goods since mid-2021.  SUMF #76.  The WT Parties have ceased all sales of disposable gloves since 2022 and have no intention of selling such items in the future now that the pandemic is over.  SUMF #77.  The WT Parties are toy companies who have no intention of ever purchasing, selling, distributing, and/or otherwise transacting goods and/or product manufactured by and/or sourced from Plaintiff, Hongze, or any other glove manufacturer. SUMF #78.

There are many companies that offer protective gloves in the United States.  SUMF #79.

## III.    RELEVANT PROCEDURAL HISTORY

Plaintiff filed suit on June 9, 2021.  (Dkt. 1.)  On July 1, 2021, Plaintiff filed its FAC alleging three causes of action: (1) federal unfair competition in violation of the Lanham Act § 43(a), 15 U.S.C. § 1125(a); (2) false advertising in violation of the Lanham Act; and (3) unfair competition in violation of California Business and Professions Code Section 17200.  (Dkt. 13.)   Plaintiff's claims are based on a few pieces of media.  First, regarding the box design shown below:



The false designation of origin claim relates to the circle in the lower right-hand

corner which reads, "Manufacturer: Shijiazhuang Hongray Group Co., Ltd."  The false advertising claim relates to the use of the word "Nitrile" on the packaging.  The false advertising claim also involves claims in other media that the gloves in the Hongray Lot were "FDA Approved" based upon 510(k) numbers K182600 and K051662.

## IV.  ARGUMENT

### A.  Standard

"A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  The court should state on the record the reasons for granting or denying the motion." Fed. R. Civ. P. 56(a).

Summary judgment is "an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  A motion for summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986).  The moving party has the burden of showing that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323.  Once the moving party meets its initial burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250.  "A mere scintilla of evidence supporting the non-moving party's position is insufficient" – the moving party will prevail on summary judgment after meeting its initial burden unless there is evidence "on which a reasonable jury could return a verdict for the non-moving party." *Id.* at 248.

Based on the record in this case, there is no genuine dispute of material fact as to the issues identified below.  The WT Parties are therefore entitled to judgment as a matter of law.

**B.** <u>**The WT Partes Are Entitled To Summary Judgment on Plaintiff's Counterfeiting Claim and Request for Counterfeiting Remedies**</u>

While Plaintiff has not asserted a specific cause of action for counterfeiting, Plaintiff alleges on *28 separate occasions* that the goods at issue are "counterfeit." FAC, ¶¶ 14-15, 18-20, 22-23, 27-28, 32-33. In addition, Plaintiff expressly seeks relief afforded only to a plaintiff that successfully proves a claim for counterfeiting. *Id.* at Prayer ¶¶ G-J. For example, Plaintiff seeks "an order from this Court compelling Defendants to inform all customers who purchased counterfeit Hongray Nitrile Gloves that it willfully sold counterfeit patient examination gloves." *Id.*, Prayer at ¶ H. Plaintiff also seeks an injunction prohibiting the WT Parties from "[s]elling counterfeit Hongray Nitrile patient examination gloves" and from "[a]dvertising counterfeit Hongray Nitrile patient examination gloves." *Id.*, Prayer at ¶ G(1)-(2). Further, Plaintiff seeks a constructive trust "imposed on all revenue, income and things of value derived by Defendants in the marketing and selling of patient counterfeit Hongray Nitrile patient examination gloves." *Id.*, Prayer at ¶ J.

A counterfeiting claim requires "a counterfeit of a mark that is registered on the principal register in the United States Patent and Trademark Office . . . ." 15 U.S.C. §1116(d)(1)(B)(1). In this case, there is no registration for HONGRAY on the principal register with the USPTO nor has Plaintiff alleged any. SUMF #12. As a result, the WT Parties are entitled to summary judgment on Plaintiff's claim that the WT Parties sold counterfeit Hongray goods and Plaintiff's requested counterfeit-based relief.

In response, Plaintiff will likely argue that it has not asserted a counterfeiting cause of action and thus, there is nothing for the Court to grant. Plaintiff, however, ignores the fact that it has both claimed that the WT Parties have sold counterfeit goods and it seeks relief to which it would only be entitled if it prevailed on a counterfeiting claim. In a similar case in the Northern District of California, the court dismissed a claim "to the extent that it assert[ed] a claim for trademark counterfeiting" even though the complaint was "devoid of any explicit allegations of counterfeiting" because the plaintiff sought damages

under 15 U.S.C. § 1117(b), (c), which are only triggered by counterfeiting. *Playvision Labs, Inc. v. Nintendo of Am., Inc.*, No. C14-05365 CRB, 2015 WL 12941892, at *1-2, n.1 (N.D. Cal. May 18, 2015). That is precisely the situation presented here.

The WT Parties are entitled to summary judgment on Plaintiff's counterfeiting claims, including its requested counterfeiting remedies.

## C. **Plaintiff's Lanham Act Claims Fail Because Plaintiff Cannot Demonstrate Entitlement to Any Relief**

### 1. *Plaintiff Did Not Suffer Any Damages Proximately Caused by the Alleged False Advertising or False Designation of Origin*

"Under the Lanham Act, [a plaintiff] may recover any damages it has sustained, 'subject to the principles of equity.'" *Hansen Bev. Co. v. Vital Pharm., Inc.*, No. 08-CV-1545-IEG (POR), 2010 U.S. Dist. LEXIS 79218, at *11 (S.D. Cal. Aug. 3, 2010). "A plaintiff must prove both the fact and the amount of damage. Damages are typically measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement," false designation of origin, or false adverting. *Lindy Pen Co. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir. 1993) (superseded by statutes on other grounds) (internal citations omitted).

To survive summary judgment for a false designation of origin claim under Section 43(a)(1)(A), Plaintiff must provide evidence that, amongst other things, "plaintiff has been or is likely to be damaged by the [false designation] . . . ." *Upper Deck Co. v. Flores*, 569 F. Supp. 3d 1050, 1061 (S.D. Cal. 2021).

Similarly, in order to avoid summary judgment on a false advertising claim under the Lanham Act, "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant's advertising; and that occurs when deception of consumers causes them to withhold trade from the plaintiff." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 133 (2014). A plaintiff "cannot obtain relief without evidence of injury proximately caused by [defendants'] alleged misrepresentations." *Lexmark Int'l, Inc. v. Static Control*

*Components, Inc.*, 572 U.S. 118, 140 (2014)   Proximate causation may be shown when "there is likely to be something very close to a 1:1 relationship between" a plaintiff's lost sales and the sales diverted to a defendant.  *Id.* at 139.

The WT Parties are entitled to summary judgment because Plaintiff has failed to provide any evidence of economic or reputational harm proximately caused by any alleged false designation of origin or false advertising.  For example, Plaintiff has not and cannot establish that any sale made by the WT Parties would have gone to Hongray nor is there any evidence its reputation was injured.  SUMF #61.  To the contrary, even Plaintiff's own expert admits that merchants were, and continue to be, happy to do business with Plaintiff.  SUMF # 62.

Plaintiff also admits that it could not have filled orders in the United States that the WT Parties filled because Plaintiff lacked access to shipping containers to do so.  SUMF ##10-11.  Moreover, Plaintiff is just one of many suppliers of disposable gloves in the United States.  SUMF ##18-19, 79.  The evidence in this case confirms that consumers did not choose to purchase gloves from the WT Parties instead of Plaintiff because of any alleged false advertising.  SUMF ##45-50.  Thus, even if any false designation of origin or false advertising occurred, Plaintiff cannot show that such acts were the proximate cause of any harm.  *ThermoLife Int'l, LLC v. BPI Sports, LLC,* No. 21-15339, 2022 WL 612669, at *2-3 (9th Cir. Mar. 2, 2022) (affirming dismissal of false advertising claim because there were many different manufactures of supplements and the plaintiff failed to show that the defendant's advertising caused a consumer to choose the plaintiff instead of the defendant).

The same is true with respect to any alleged reference, use, or association by the WT Parties to the 510k registrations for Better Care and Grand Work as Plaintiff has not nor can it show that it suffered any harm proximately caused by such reference, use, or association.  Indeed, Plaintiff's own expert admits that merchants were, and continue to be, happy to do business with Plaintiff.  SUMF #62.

Lastly, Plaintiff has abandoned any contention that it suffered actual damage due to corrective advertising.  SUMF ##58-60.  Plaintiff originally designated an expert who

opined that Plaintiff's general advertising and marketing efforts could have included corrective advertising, which she intended to demonstrate in a supplemental report. SUMF ##58-59. Plaintiff's expert, however, subsequently withdrew all opinions related to corrective advertising on November 30, 2023. SUMF #60.

Thus, Plaintiff cannot demonstrate that it suffered any actual damages as a result of any false designation of origin or false advertising as alleged. *See* FAC, ¶¶ 29, 30, 34. The WT Parties are entitled to summary judgment on Plaintiffs' claim of actual damages.

### 2. *There Are No Profits to Disgorge As a Matter of Law*

The is no dispute of genuine fact that the WT Parties made no profit from the Hongray Lot or from the sale of gloves. SUMF ##16, 20-27, 30, 34-37, 39-40, 51-52. In fact, the evidence confirms that the WT Parties sustained substantial losses. *Id.*

The WT Parties paid a total of $10.6 million for 866,450 boxes of gloves that comprise the Hongray Lot. SUMF ## 25, 27, 34-36. The payment was derived from three sources: (1) $5 million from Win for its portion of the Hongray Lot (423,729 boxes); (2) $3.6 million loan from the WT Parties' lender for which the WT Parties now owe more than $6 million; and (3) $2 million of its own funds. SUMF ##27, 35-36. The WT Parties' portion of the Hongray Lot was taken by M2M and sold in Mexico, however, it is undisputed that M2M never paid the WT Parties for these gloves. SUMF ##23, 39-43. As such, it is undisputed that the WT Parties did not make a profit on the Hongray Lot. SUMF #51-52.

The same is true with respect to all of the gloves sold by the WT Parties. The WT Parties purchased and imported 2,795,829 boxes of gloves in total at a total cost of $23,041,633, including shipping. SUMF ##20-21. The WT Parties' accounting records further confirm that they sold sold 2,333,493 boxes of gloves for $22,189,457. SUMF # 22. The balance of the gloves were taken by M2M and distributed in Mexico, however, Mind2Market admitted during deposition that it never paid the WT Parties for those gloves. SUMF #23. Excluding storage and warehousing expense, the WT Parties suffered a loss of $852,176 on the cost of the gloves alone. SUMF #24.

In response, Plaintiff will argue that shipping documents prepared by Elaine Dong of Feida Toys claims that the cost of the gloves were only $1 per box. These shipping records are not evidence of payment. Indeed, as Ms. Dong has made clear, the amount referenced in the shipping documents is not representative of what the WT Parties actually paid for gloves. SUMF ##37-38. Rather, the WT Parties' accounting records accurately reflect the amount of money the WT Parties actually paid for gloves. SUMF ##20-24. The mere scintilla of evidence (i.e. the shipping records) is insufficient to create a triable issue of fact particularly where, as here, the actual financial records of the WT Parties confirm the amount actually paid for gloves. *Anderson*, 477 U.S. at 248. As such, the WT Parties are entitled to summary judgment on Plaintiff's claim to disgorge profits.[2]

Even assuming the WT Parties profited from the sale of Hongray gloves, in the Ninth Circuit, willfulness is a material fact to consider before a court will disgorge an infringer of its ill-gotten profits. *See Yuga Labs, Inc. v. Ripps*, No. CV 22-4355-JFW(JEMX), 2023 WL 7089922, at *10 (C.D. Cal. Oct. 25, 2023) (quoting *Romag Fasteners, Inc. v. Fossil, Inc.*, 140 S. Ct. 1492, 1497 (2020) (holding that a defendant's mental state is "a highly important consideration in determining whether an award of profits is appropriate . . . ."). In the present case, the facts establish either that the WT Parties properly imported Hongray gloves from HKMI or they got duped. SUMF ##28, 34-36, 53-57, 63-73. Under either scenario, willfulness cannot be shown and the totality of the facts show that disgorgement would not be appropriate in this case, even if the WT Parties made any profits, which they did not. *See Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc*., No. SACV1701613CJCDFMX, 2023 WL 2652855, at *5 (C.D. Cal. Mar. 13, 2023) (finding

---

[2]     Even if a jury was to accept that the WT Parties paid $1 per box for the Hongray Lot, Plaintiff admitted that it received 8.1 million RMB or approximately $870,967 from HKMI for legitimate Hongray gloves. SUMF ##54-55. At $1 per box, that would mean that HKMI purchased 870,967 boxes of legitimate Hongray gloves – almost the exact number of boxes identified in the 32 bills of lading Ms. Dong confirmed were the only Hongray gloves ever purchased by the WT Parties. *Compare* SUMF ## 54-55 (Plaintiff's admission that it was paid $870,967 for legitimate Hongray gloves) *with* SUMF #30 (32 shipments reflecting the WT Parties' importation of 866,450 boxes of Hongray gloves).

at worst, the defendant's conduct was negligent not willful and did not favor disgorgement).

    3.    *Injunctive Relief Is Not Appropriate Because Plaintiff Cannot Demonstrate a Likelihood of Continual or Future Harm*

A plaintiff seeking "prospective injunctive relief . . . must demonstrate that he has suffered or is threatened with a 'concrete and particularized' legal harm, coupled with 'a sufficient likelihood that he will again be wronged in a similar way.'" *Bates v. UPS*, 511 F.3d 974, 985 (9th Cir. 2007) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). "As to the second inquiry, he must establish a 'real and immediate threat of repeated injury.'" *Id* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).

Injunctive relief is not proper in this matter as Plaintiff cannot demonstrate that it will likely suffer the same harms/wrongs as alleged in the FAC and that there is a "real and immediate threat of repeated injury." This case involves the selling of a particular shipment of gloves that were delivered in early 2021, almost two years ago. It is undisputed that the WT Parties suffered substantial losses as a result of this transaction and ceased selling disposable gloves in 2022. SUMF ##16, 20-24, 51-52, 77. It is further undisputed that the WT Parties have historically been in the toy business and that they only became involved in the sale of gloves during the height of the pandemic, which has now passed. SUMF ##14, 78. There is no evidence that the WT Parties are still engaged in any alleged wrongful conduct or that they or that there is any real and immediate threat of repeated injury. SUMF ##74-78. Plaintiff tacitly concedes that there is no ongoing and/or immediate threat of repeated injury as it has not sought or requested a preliminary injunction despite the case having been filed more than 2.5 years ago.

Furthermore, the WT Parties have no intention of ever selling disposable gloves and/or any products manufactured by, sold by, distributed by, and/or otherwise related to Plaintiff. SUMF #78. Plaintiff has placed the WT Parties, its Chinese buyer, and HKMI on a blacklist of alleged sellers of counterfeit goods and thus, there is no chance that the WT Parties will cause any harm to Plaintiff let alone any harm that is real and/or immediate.

1    SUMF # 76.  There is no likelihood of future harm and therefore injunctive relief would be

2    improper.  Accordingly, summary judgment on this equitable relief should be granted.

3    **D.    Plaintiff's False Designation of Origin Claim Fails Because the Origin of**

4    **the Goods is Accurately Stated**

5        Plaintiff's false designation of origin claim under Section 43 (a)(1)(A) independently

6    fails because there is no confusion as to the origin of the goods.  To survive summary

7    judgment for a claim under Section 43 (a)(1)(A), Plaintiff must provide evidence that "(1)

8    defendant uses a designation (any word, term, name, device, or any combination thereof)

9    or false designation of origin; (2) the use was in interstate commerce; (3) the use was in

10   connection with goods or services; (4) the designation or false designation is likely to cause

11   confusion, mistake, or deception as to (a) the affiliation, connection, or association of

12   defendant with another person, or (b) as to the origin, sponsorship, or approval of

13   defendant's goods, services, or commercial activities by another person; and (5) the

14   plaintiff has been or is likely to be damaged by these acts."  *Upper Deck Co. v. Flores*, 569

15   F. Supp. 3d 1050, 1061 (S.D. Cal. 2021).  It is axiomatic that, "the use must be wrongful

16   in some way." *Zamfir v. Casperlabs, LLC*, 528 F. Supp. 3d 1136, 1148 (S.D. Cal. 2021).

17       It is undisputed that HKMI purchased at least some of the Hongray Lot from

18   Hongray/Hongze and Hongze was paid for the purchase.  SUMF ##53-55.  With regard to

19   the remainder of the Hongray Lot, Hongray sells 5% of its gloves to the domestic Chinese

20   market such that HKMI could have purchased gloves from those sources second hand.

21   SUMF #9.  Whether or not Hongray agrees that such a transaction would be appropriate in

22   its eyes is not a material fact in the Ninth Circuit.  *Am. Circuit Breaker Corp. v. Or.*

23   *Breakers, Inc.*, 406 F.3d 577, 585 (9th Cir. 2005) ("Trademark law generally does not reach

24   the sale of genuine goods bearing a true mark even though such sale is without the mark

25   owner's consent.").

26       To show that the gloves are not genuine, there needs to be some explanation of how

27   genuine Hongray gloves differ differ from the gloves sold or offered for sale by the WT

28   Parties.  In this regard, "the only acceptable method of identifying counterfeit merchandise

-17-

is to examine it side by side with authentic merchandise." *Chung v. City of L.A.*, 406 Fed. Appx. 207, 210 (9th Cir. 2010).  Remarkably, Plaintiff's expert offered **no opinion as to the origin of the Hongray Lot or any other gloves sold by the WT Parties**.  SUMF ##56-57.  In fact, despite having the opportunity to test the Hongray gloves sold by the WT Parties and the gloves sold by Hongray to determine whether they had varying compositions, Plaintiff's expert did no such comparison.  *Id*.  Accordingly, there can be no genuine dispute of material fact that the gloves at issue are genuine, as Plaintiff's claims cannot be supported through mere supposition alone.  Plaintiff's false designation of origin claim fails as a matter of law.

### E.   Plaintiff's False Advertising Claim Further Fails As a Matter of Law

In addition to the lack of an available remedy, Plaintiff's false advertising claim also fails for several additional reasons, each of which is sufficient on its own to warrant summary judgment.

#### 1.   *No Evidence to Demonstrate that the Alleged Advertising Was False*

Plaintiff has the resources to determine the origin of the products at issue, but tellingly chose not to do so.  As noted above, the burden is on the Plaintiff to show that the WT Parties made a "false statement of fact."  Tellingly, Plaintiff's own expert does not opine that the gloves imported by the WT Parties were not in fact Hongray's product. SUMF #56.  In fact, despite having the ability to test the gloves imported by the WT Parties against "known" Hongray gloves to determine if those gloves were from Plaintiff's or its subsidiary's factory, neither Plaintiff nor its expert did so.  SUMF #57; *Chung*, 406 Fed. Appx. at 210.  Plaintiff failed to meet its burden to present evidence in this case that the origin of the product is falsely stated, and therefore the claim must fail as a matter of law.[3]

#### 2.   *The Evidence Conclusively Demonstrates that the Alleged False Advertising Was Not Material*

A false advertising claim under the Lanham Act requires proof that:   (1) the

---

[3] At the very least, summary judgment should be granted as to the 82,000 boxes of gloves that Hongray admits it sold to HKMI.  SUMF ##53-55.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

1 | defendant made a false statement of fact about a product in a commercial advertisement;
2 | (2) the statement actually deceives or has the tendency to deceive a substantial segment of
3 | its audience; (3) the deception is material; (4) the defendant caused the false statement to
4 | enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result
5 | of the false statement. *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th
6 | Cir. 1997).

7 | Materiality in false advertising cases is typically proven through consumer surveys,
8 | but that type of evidence is not required. *Skydive Ariz., Inc., v. Quattrocchi*, 673 F.3d 1105,
9 | 1110 (9th Cir. 2012); *Obesity Rsch. Inst., LLC v. Fiber Rsch. Int'l, LLC*, 310 F. Supp. 3d
10 | 1089, 1125 (S.D. Cal. 2018) ("The Court is not convinced that the Ninth Circuit has
11 | likewise determined that materiality is presumed for actually false statements, nor has
12 | [Plaintiff] cited to a Ninth Circuit case stating this."). Nonetheless, there is a requirement
13 | to show that the statements at issue had some impact on the purchasing decision. *Southland
14 | Sod Farms*, 108 F.3d at 1139 (9th Cir. 1997). The evidence in the record is to the contrary.

15 | M2M, the third-party that agreed to buy the bulk of the WT Parties' portion of the
16 | Hongray Lot in June 2022 testified that it: (1) knew that it was acquiring vinyl and/or nitrile
17 | blend gloves from the WT Parties based upon the unit price alone; (2) did not care who
18 | manufactured the gloves and/or where they were sourced from; and (3) was not even aware
19 | the packaging for gloves indicated that they were made by Plaintiff or were being sold as
20 | Hongray gloves. SUMF ##46-48. Moreover, Plaintiff's deposition of other third parties
21 | during the supplemental discovery period further confirmed that the manufacturer of the
22 | gloves was not material in purchasing decisions during the pandemic. SUMF ##45, 49-50.
23 | Plaintiff has produced no survey results or any evidence from *anyone who purchased
24 | gloves from the WT Parties* to establish materiality. Accordingly, the false advertising
25 | claim must fail.

26 | **F.** **Plaintiff Does Not Have Standing to Assert Marks of Others**

27 | Plaintiff complains that Defendants used the incorrect 510(k) numbers inside of
28 | product packaging. FAC, ¶ 16. These claims, however, further fail because Plaintiff does

not have standing to assert a claim based on the marks of others. "Ownership of a 510(k) is determined by the identification in the cover letter of the 510(k) who is submitting the 510(k); however, the person who submits the 510(k) might not be the owner, if that person is submitting it on behalf of a company. The FDA does not make a legal determination regarding ownership. Instead, the FDA states that they 'understand' that the applicant is the owner." *Krauser v. BioHorizons, Inc.*, 903 F. Supp. 2d 1337, 1343 (S.D. Fla. 2012).

It is undisputed that the sole plaintiff in this action is Shijiazhuang Hongray Group. Dkt. 1 and 13. While they are referenced in the FAC, ***neither Better Care nor Grand Work are parties to this action***. *Id.* In fact, Plaintiff has represented to this Court and to the WT Parties that neither Better Care nor Grand Work are directly involved in this case and as such, Plaintiff was not required to produce persons most knowledgeable to appear for deposition pursuant to Rule 30(b)(6) notices. Dkt. 49-1.

There can also be no dispute that Plaintiff is neither the owner nor the registrant for either of the 510(k) numbers at issue. SUMF ##3-5. Instead, such interests belong to Better Care and Grand Work, as admitted by Plaintiff in the FAC. SUMF ##3-5. As such, Plaintiff lacks standing as a matter of law to assert any claims based upon the alleged violation of the 510(k) numbers referenced in the FAC. *Better Care Plastic Tech. Co.*, 2021 U.S. Dist. LEXIS 191312, at *3 (C.D. Cal. July 21, 2021).[4]

Plaintiff may argue that as the parent of Better Work and Grand Work, it is allowed to assert their intellectual property rights, such as a 510(k) registration. Such a contention, however, has been expressly rejected by numerous courts in the Ninth Circuit. *See, e.g., Stevo Design, Inc. v. SBR Mktg.*, 919 F. Supp. 2d 1112, 1120 (D. Nev. 2013) ("A parent may not assert the intellectual property rights of its subsidiary in a copyright infringement action"); *see also Lanard Toys, Ltd. v. Novelty, Inc.*, 511 F. Supp. 2d 1020 (C.D. Cal. 2007)

---

[4]     In fact, Plaintiff and their counsel are aware of such a standing requirement as Plaintiff's current counsel represented Better Care in *Better Care Plastic Technology Co., Ltd. v. Gredale, LLC*, No. 5:21-cv-00216-JWH-SPx (C.D. Cal. 2021) (the "Better Care Case"), another unfair competition and false advertising case based upon alleged misuse of another one of Better Care's 510(k) numbers filed in this very Court.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT

1  (granting summary judgment in defendants' as to copyright infringement claim as to the

2  parent company trying to assert the claim on behalf of its subsidiary).

3       In this case, Plaintiff has not presented any evidence in discovery or otherwise that

4  it has the proper standing to assert unfair competition/false advertising claims relating to

5  alleged misuse of 510(k) numbers that it has no ownership or beneficiary interest in.  Such

6  a lack of standing is fatal to any such claims raised in this case.  As such, the Court should

7  find that Plaintiff cannot prevail on any claims based upon the alleged misuse or

8  misattribution of 510(k) numbers K182600 and K051662 by the WT Parties as a matter of

9  law and enter summary judgment as to the WT Parties on such claims.

10      **G.    Plaintiff's UCL Claim Fails Because No Remedy Is Available**

11           1.    *Disgorgement of Profits Is Not A Remedy Under the UCL and No*

12                *Factual Basis for Restitution Exists*

13      Under California's unfair competition law (the "UCL"), a plaintiff must prove a loss

14 of money or property caused by the purported unfair competition to qualify for relief as the

15 only remedies available under a Section 17200 claim are restitution and injunctive

16 relief.  *See* Cal. Bus. & Prof. Code § 17204; *Clark v. Super. Ct.*, 50 Cal.4th 605, 610,

17 (2010).  In the context of Section 17200, "restitution means the return of money to those

18 persons from whom it was taken or who had an ownership interest in it." *Shersher v. Super.*

19 *Ct.*, 154 Cal. App. 4th 1491, 1497 (2007).  As the California Court of Appeal in *Lee v.*

20 *Luxottica Retail North America, Inc*., 165 Cal.App.5th 793 (2021) recently, explained:

21       First,  the   [California]  Supreme  Court  held  that nonrestitutionary
22       disgorgement of profits—that is, profits that are neither money a defendant
         took from the plaintiff nor funds in which the plaintiff has an ownership
23       interest—is  not  an  authorized  remedy  under  the  UCL  in  an  individual
         action. (See *Korea Supply*, 29 Cal.4th at pp. 1140, 1144-48, 1152.) It
24       extended this principle from the rule already established in the context of
25       representative suits brought under the UCL. (See *Korea Supply*, at pp. 1144-
         1145; *Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 137
26       [96 Cal. Rptr. 2d 485, 999 P.2d 718], superseded by statute on other grounds
         as stated in *Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior*
27       *Court* (2009) 46 Cal.4th 993, 1000 [95 Cal. Rptr. 3d 605, 209 P.3d 937].) It
28

also examined the statute's history and purpose, and found "nothing to indicate that the Legislature intended to authorize a court to order a defendant to disgorge all profits to a plaintiff who does not have an ownership interest in those profits." (*Korea Supply*, at p. 1147.)

*Id.* at 800-01.

In the present case, Plaintiff seeks "restitution and/or disgorgement of Defendants' profits and other ill-gotten gains wrongfully obtained through its unfair and deceptive practices." FAC, ¶ 40.  Plaintiff, however, has not provided any evidence that the WT Parties have in their possession any money or property of Plaintiff's.  A "restitution order against a defendant thus requires both that money or property have been lost by a plaintiff, on the one hand, and that it have been acquired by a defendant, on the other." *Kwikset Corp. v. Super. Ct.*, 51 Cal.4th 310, 336 (2011).  As there is no proof of this, no restitution can be granted as a matter of law.  Further, any remedy of injunctive relief either fails as argued below or is redundant to relief provided under the Lanham Act.  Under either theory, there is no relief available for the claim under Cal Bus. & Prof. Code § 17200 and the claim accordingly fails.  The WT Parties are entitled to summary judgment as to Plaintiff's damages claim under Section 17200.

### 2.    *Injunctive Relief Is Not Available As a Remedy*

To maintain a cause of action for injunctive relief, Plaintiff must "show[] that the wrongful act constitutes an actual or threatened injury to property or personal rights which cannot be compensated by an ordinary damage award." *Brownfield v. Daniel Freeman Marina Hosp.*, 208 Cal.App.3d 405, 410 (1989); *see also Prudential Home Mortgage Co. v. Superior Court*, 66 Cal.App.4th 1236, 1250 (1998) (applying principle to UCL claim).  Here, the undisputed record confirms that there is no actual or threatened injury to Plaintiff's property or personal right as the WT Parties ceased selling gloves years ago and have resumed their decades-long toy business now that the pandemic has waned.  SUMF ##14, 74-78.  As such, Plaintiff is not entitled to injunctive relief under the UCL.

/ / / /

## V.    <u>CONCLUSION</u>

Based upon the arguments set forth above and the undisputed facts and evidence provided in support of this Motion, the Court should grant summary judgment in WT Parties' favor and against Plaintiff as to all claims made by Plaintiff in the First Amended Complaint.   Alternatively, the Court should grant partial summary judgment as to the various issues and parts of claims/defenses raised in the motion in the WT Parties' favor and against Plaintiff.


 DATED:  December 29, 2023          **McKOWN BAILEY**


                                                    */s/Aaron M. McKown*
                                                    Aaron M. McKown
                                                    William P. Cassidy, Jr.
                                                    Michael O'Brien
                                                    Attorneys for Defendants WORLD TRADING 23, INC. and WORLD TECH TOYS, INC.

DEFENDANTS' MOTION FOR SUMMARY JUDGMENT
OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT